[Cite as *State v. Caulton*, 2011-Ohio-6636.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 09 MA 140 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| ANTHONY CAULTON, aka | ) | |
| TONY PHIFFER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from Common Pleas
Court, Case No. 06 CR 1191.

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee: Attorney Paul J. Gains
Prosecuting Attorney
Attorney Ralph M. Rivera
Assistant Prosecuting Attorney
21 W. Boardman St., 6th Floor
Youngstown, OH 44503

For Defendant-Appellant: Attorney John P. Laczko
3685 Stutz Drive, Suite 100
Canfield,, OH 44406

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Gene Donofrio

Dated: December 16, 2011

DeGenaro, J.

{¶1} Defendant-Appellant, Anthony Caulton appeals the August 4, 2009 judgment of the Mahoning County Court of Common Pleas convicting him of one count of murder, with an accompanying firearm specification, and sentencing him accordingly. Caulton raises four assignments of error: involving speedy trial; failure to conduct a new suppression hearing; manifest weight, and failure to instruct the jury on manslaughter.

{¶2} All of Caulton's arguments are meritless. First, Caulton's speedy trial rights were not violated; because of tolling events, less than 270 days elapsed between his arrest in Mahoning County and his execution of a speedy trial waiver. Second, the trial court did not err by failing to conduct a new suppression hearing before the successor judge; Caulton only challenged the credibility of the witnesses' identification at the scene, which is properly tested at trial, he did not challenge the propriety of the photo array. Third, by convicting Caulton of murder the jury clearly did not lose its way so as to create a manifest miscarriage of justice. Finally, because the facts of this case do not reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter, the trial court properly and reasonably declined to instruct the jury on the offense of voluntary manslaughter. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3} On November 2, 2006, Caulton was indicted by the Mahoning County grand jury on counts of: (1) murder (R.C. 2903.02(A)), an unclassified felony, with an accompanying R.C. 2941.145(A) firearm specification; (2) having a weapon while under a disability (R.C. 2923.13(A)(3)(B)), a third-degree felony; (3) illegal conveyance or possession of a deadly weapon or dangerous ordnance into a school safety zone (R.C. 2923.122(B)(D)), a fifth-degree felony; and (4) inducing panic (R.C. 2917.31(A)(3)(C)(4)(a), a fourth-degree felony. The indictment alleged that Caulton purposely caused the death of Larry Jones by shooting him multiple times at the South Field House in Youngstown, during a pee wee football game.

{¶4} Caulton was arrested in the State of Washington on October 2, 2006, charges having been originally filed against him in the Youngstown Municipal Court on

August 24, 2006. Caulton waived extradition and was returned to custody in Mahoning County on October 31, 2006. Caulton was arraigned, pled not guilty and counsel was appointed. While motion practice will be discussed in greater detail in the analysis of the first assignment of error, which alleges a speedy trial violation, the major points are as follows. On February 20, 2007, the trial court granted Caulton's motion for relief from prejudicial joinder, severing the murder charge from the weapons disability charge. On March 27, 2007, Caulton filed a motion to suppress pretrial identifications of two witnesses, along with his statement to police following his arrest.

{¶5} At that time, the judge assigned to the case was Judge Cronin, and she conducted the suppression hearing on May 23, 2007, where three witnesses testified. Denise Leonard, who was familiar with both the victim and the defendant before the incident on August 19, testified that she witnessed both men scuffling on the bleachers during the football game, and then saw a gun in Caulton's hand. She heard gunshots but did not see the actual shooting. Leonard was interviewed by police on August 26, where she identified No. 2 (Caulton) as the man she saw with the gun, from a six-person photo array. At first Leonard stated that she did not view or hear any news coverage about the shooting prior to her identification. She subsequently stated she did recall hearing that the police were looking for Caulton.

{¶6} Thomas witnessed the shooting from a close, unobstructed distance and did not know either man prior to the incident. Thomas was presented with a six-person photo array six days after the shooting and selected "No. 2," i.e., Caulton. Thomas testified that he neither saw nor heard media coverage of the shooting during that six day period between the shooting and his identification. Finally, Detective Kelty testified that he showed the photo arrays to Leonard and Thomas and that both chose No. 2, which was Caulton. The remainder of Det. Kelty's testimony centered on his custodial interview with Caulton, which is not at issue on appeal.

{¶7} On July 1, 2007, Judge Cronin retired from the bench without issuing a ruling on the motion to suppress. Thereafter, this case went through several judges. On October 4, 2007, Caulton filed a motion to dismiss based on speedy trial grounds,

alleging he had been held in excess of the time permitted by Ohio law. The crux of Caulton's argument was that the trial court's delay in ruling on the motion to suppress was unreasonable. In that same motion he requested a hearing on the suppression motion, but did not fully brief this issue. The case was assigned to a third judge who recused himself and the case was transferred to a fourth trial judge on November 2, 2007. After obtaining leave from the court, Caulton filed a more extensive motion requesting a new suppression hearing.

{¶8} On January 24, 2008, the trial court conducted a hearing on the motion to dismiss and the motion for a new suppression hearing. The next day, the trial court overruled the motion to dismiss, and overruled the motion to suppress the two pretrial identifications only. In so doing, the trial court relied upon the transcript of the suppression hearing that was held before the judge originally assigned the case. On January 30, 2008, the trial court granted the motion to suppress Caulton's post-arrest statement to police on Miranda grounds. On February 11, 2008, Caulton executed a speedy trial waiver.

{¶9} On April 8, 2008, Caulton filed a second motion to dismiss based on speedy trial grounds, which essentially repeated the same arguments made in the first motion. It appears from the record that the trial court never specifically ruled on this motion, so we presume it was denied. See *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 223, 631 N.E.2d 150.

{¶10} For reasons that are unclear from the record, the case was transferred to a fifth, visiting judge. The State dismissed Counts Three and Four of the indictment: having a deadly weapon in a school zone and inducing panic, respectively.

{¶11} The case proceeded to a jury trial on the murder charge with firearm specification where the following evidence was adduced. On August 19, 2006, Larry Jones went to watch his nephew's pee wee football game at the South Field House in Youngstown. Denise Leonard, who was familiar with Jones from the neighborhood, was at the game with friends and briefly exchanged greetings with Jones while there. Later in the game she saw Jones "tussling" with Caulton on a landing to the bleachers. Leonard

was familiar with Caulton, whom she knew as "Tone." She was not really paying much attention to the two men, until she heard someone saying "he got a gun." She then saw a gun in Caulton's hand. She did not see Jones with a gun, but rather saw him run away from Caulton. Leonard was very close to where the shots were fired, but did not see the actual shooting occur. Leonard later identified Caulton in a photo array as the man who had the gun in his hand. Leonard was a reluctant witness, she did not come forward to police on her own, instead detectives surprised her with an interview while she was at felony dependency court on August 24, apparently because she told her caseworker she was at the game.

{¶12} Danielle Howard, a good friend of Jones' sister, was also at the game. She went to approach Jones to talk to him, but then saw a man walk up to Jones. She saw Jones throw up his hands in what appeared to be an invitation to fight. The other man pulled out a gun and chased Jones past her. Jones ran up the bleachers and after tussling with the other man for a moment, went over the railing and onto the field. Howard heard 1 gunshot, then 3 to 4 seconds later she heard 4 or 5 more. She did not see the actual shooting occur; as soon as she heard the first shot she grabbed the children she was with and started running. She did not talk to the police at the scene since her focus was on the safety of the children. She called Jones' sister to notify her about the shooting. On cross, Howard conceded that during a later interview with police she was shown a photo array and believed the shooter was another person in the array, not Caulton.

{¶13} Christopher Thomas witnessed the actual shooting from a close, unobstructed distance. He first saw the victim running towards him, being chased by another man. He heard someone shout, "he has a gun," and then saw the two men scuffling. When the victim attempted to go over the railing to escape, the shooter took his first shot. Thomas explained: "He shot him. He fell to the ground. He shot him again. The shooter then turned his back towards me like he was getting ready to go, like he took a few steps like he was getting ready to leave, and then came back and finished him off," firing several more shots into the victim as he lay on the football field.

**{¶14}** Thomas gave a description of the shooter to one of the police officers at the scene. He went directly home and drew a diagram of what he had witnessed, because he wanted to be accurate and remember everything. Several days later, on August 25, 2006, he was interviewed by police, shown a photo array, and selected Caulton as the shooter. He knew neither the victim nor the shooter before the incident and did not see any news accounts with Caulton's picture or name prior to making his identification. He testified he was positive that the man he described to police on the day of the shooting, the man selected in the photo array and the man he identified in the courtroom (the defendant) is the same man he saw shoot and kill Larry Jones; he stated he got a direct look at the shooter's face. On cross he was confronted with a few very minor inconsistencies between his earlier suppression hearing testimony and his trial testimony.

**{¶15}** Tyla Smith, who was coaching young cheerleaders on the sidelines during the game, testified that she noticed two men running in the stands. Upon realizing that one of the men had a gun, Tyla took off running to try to get the cheerleaders away from the danger. After she reached the inside of the field, Smith said she heard shots and then chaos ensued. Her main focus was getting the cheerleaders, who were between the ages of 4 and 12, out of harm's way. Smith was unsure about how many gunshots she heard, although she agreed it was more than one. She recalled hearing all of the gunshots together, and did not recall hearing any gunshots after the victim was already on the ground. She told police that she could not identify anyone as the shooter because as soon as she saw the gun, she started running.

**{¶16}** Youngtown Police Officer Edward Kenney responded to the shooting shortly after it occurred. The scene was chaotic, with hundreds of people milling around, some walking and some running from the field. Officer Kenney questioned people at the scene about what happened, but was generally offered no assistance. For example, people stated: "you're the police, you figure it out. You want us to do your job for you?"

**{¶17}** Officer Kenney obtained the shooter's description from Christopher Thomas, who had described him as a "5'5" to 5'7" black male, dark skin, 18 to 21, white T-shirt, blue jean shorts, short hair or braids, 9mm black automatic, white sneakers." He

broadcast this description over the police radio. While investigating at the scene, Officer Kenney overhead people saying that a man named "Muldrow," was the shooter, and consequently his report listed "Muldrow" as a possible suspect.

{¶18} Later, when Detective Kelty arrived, someone walked past him and whispered the name "Anthony Phiffer." That person refused to stop and talk further to police. Police later determined that Caulton is also known as Anthony Phiffer, and these names were released to the news media as a "person of interest." Det. Kelty stated that his investigation ruled out the other possible suspect, Muldrow.

{¶19} The victim, Jones, was transported to St. Elizabeth's Hospital where he died as a result of his injuries. Dr. Ohr, a medical examiner for the Mahoning County Coroner's Office, testified regarding the cause and manner of Jones' death. The coroner who actually performed the autopsy was unavailable, and Dr. Ohr thus testified as a substitute witness by stipulation of the parties. Dr. Ohr reviewed the case file including the autopsy photographs and reports and reached his own conclusions regarding the death. Dr. Ohr found that Jones suffered eight gunshot wounds. The bullet which entered through Jones' back and exited via his lower chest wall tore through two major vessels and caused Jones to bleed out into his chest and ultimately die.

{¶20} Jonathan Gardner, a firearms examiner from the Ohio Bureau of Criminal Identification and Investigation (BCI) analyzed seven 9mm cartridge casings, and one copper-jacketed slug which were recovered from the scene and submitted to his lab for analysis. Two of the three bullets were recovered from Jones' body and were also analyzed. Gardner determined that all seven 9mm cartridge casings were fired from the same firearm, and that all three bullets were fired from the same firearm.

{¶21} Several other witnesses provided background testimony about the scene at the South Field House, the police investigation, and the circumstances surrounding Caulton's arrest, namely that a detective obtained possession of Caulton from the United States Marshals at Pittsburgh International Airport. These witnesses included the victim's mother and sister, and several members of the Youngstown police force.

{¶22} After the State rested, the defense made a Crim.R. 29 motion for acquittal,

which was overruled. The defense then rested without presenting any witnesses. The jury found Caulton guilty of murder with the accompanying firearm specification. After the jury verdict, the State dismissed the previously severed weapons under disability charge. Following a hearing, the trial court sentenced Caulton to 15 years to life on the murder charge, to be served consecutively to 3 years on the firearm specification.

### Speedy Trial

{¶23} In his first of four assignments of error, Caulton asserts:

{¶24} "The trial court erred to the prejudice of Appellant and violated his statutory and constitutional rights to a speedy trial by denying his motions to dismiss due to expiration of speedy trial for Appellee's failure to bring Appellant to trial within the period specified in R.C. 2945.71."

{¶25} Ohio recognizes both a constitutional and a statutory right to a speedy trial. *State v. King* (1994), 70 Ohio St.3d 158, 161, 637 N.E.2d 903; see also Sixth Amendment, United States Constitution; Section 10, Article I, Ohio Constitution. The Sixth Amendment of the U.S. Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy [trial]." This fundamental right has been codified by the General Assembly as R.C. 2945.71 to 2945.73. The Supreme Court of Ohio has found the statutory speedy-trial provisions set forth in R.C. 2945.71 to be coextensive with constitutional speedy-trial provisions. *State v. O'Brien* (1987), 34 Ohio St.3d 7, 9, 516 N.E.2d 218.

{¶26} R.C. 2945.71 provides the time-frame for a defendant's right to a speedy trial based on the level of offense. According to the Ohio Revised Code, "a person against whom a charge of felony is pending shall be brought to trial within two hundred seventy days after his arrest." R.C. 2945.71(C)(2). However, each day the defendant spends in jail in lieu of bail, solely on the pending criminal charge, counts as three days. R.C. 2945.71(E). *State v. Brown* (1992), 64 Ohio St.3d 476, 479, 597 N.E.2d 97.

{¶27} Once the statutory limit for speedy trial has expired, the defendant has established a prima facie case for dismissal and the burden shifts to the State to demonstrate any tolling or extension of the time limit. *State v. Howard*, 7th Dist. No. 08

BE 6, 2009-Ohio-3251, at ¶18, citing *State v. Price* (1997), 122 Ohio App.3d 65, 68, 701 N.E.2d 41, citing *State v. Butcher* (1986), 27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368.

**{¶28}** R.C. 2945.72 provides a list of tolling events, relevant to this case are sections: (E) "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;" and (H) "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.] "R.C. 2945.72(E), (H).

**{¶29}** When reviewing a speedy trial issue, this court must count the days of delay chargeable to either side and determine whether the case was tried within the time limits pursuant to R.C. 2945.71. *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶8. Our review of a trial court's decision regarding a motion to dismiss for violation of the speedy trial provisions involves a mixed question of law and fact. *State v. Brown* (1998), 131 Ohio App.3d 387, 391, 722 N.E.2d 594. We give due deference to the trial court's findings of fact if they are supported by competent, credible evidence. Id. However, we independently determine whether the trial court properly applied the law to the facts of the case. Id. When reviewing the legal issues in a speedy trial claim, we must strictly construe the statutes against the State. See *Brecksville v. Cook* (1996), 75 Ohio St.3d 53, 57, 661 N.E.2d 706; *Brown* at 391.

**{¶30}** Here Caulton correctly concedes that the State had 270 days to bring him to trial because he was being held on two unrelated charges. See R.C. 2945.71(C)(2) , *Sanchez* at ¶7 ("the triple-count provision does not apply when a defendant is being held in custody pursuant to other charges.") Thus, this court must determine whether Caulton's speedy trial clock expired before he executed a waiver of his rights on February 11, 2008. Caulton has made out his prima facie case because 468 days elapsed between the time he was brought into custody in Mahoning County and the time he executed the time waiver.

**{¶31}** The State alleges that numerous tolling events occurred which prevented the expiration of Caulton's speedy trial clock before the 270th day. It is undisputed that from the time Caulton was taken into custody in Mahoning County on October 31, 2006,

until Caulton filed a request for discovery on January 8, 2007, the speedy trial clock ran for a period of 69 days.

**{¶32}** At that point, the parties argue over whether the January 8 discovery motion was a tolling event. The Supreme Court of Ohio has previously held that discovery requests are tolling events pursuant to R.C. 2945.72(E). *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, at ¶23, 24, and 26. Nonetheless, Caulton contends that his discovery motion did not toll the clock because "a review of the record indicates Appellee provided discovery to Appellant pursuant to local Rule 9 on November 21, 2006." This argument is meritless. The record reveals that on November 21, 2006, Caulton both requested and received an initial discovery packet from the State. However, the January 8, 2007 request sought additional discovery, above and beyond that which was provided on November 21, 2006. The State correctly asserts that it complied with the January 8, 2007 discovery on January 31, 2007 and thus the clock was tolled until that time. And in any event, Caulton also filed a request for a bill of particulars on January 8, 2007, which the State filed on January 10, 2007, thus tolling the clock until then. *Brown*, supra at ¶18.

**{¶33}** Another tolling event occurred on January 10, 2007, when Caulton filed a motion to continue trial. Caulton does not include this in his speedy trial calculation, however, it is well-established that a defense motion to continue trial tolls the speedy trial clock until the rescheduled trial date. R.C. 2945.72(H); *State v. Brown*, 7th Dist. No. 03-MA-32, 2005-Ohio-2939, at ¶41. Here Caulton's trial date was continued until February 28, 2007, thus tolling the clock until then.

**{¶34}** A third set of tolling events occurred on February 20, 2007 when Caulton filed three motions: (1) motion for relief from prejudicial joinder, (2) motion for ex parte order authorizing an investigator at the State's expense, and (3) a motion to continue trial. Caulton's trial was continued until April 25, 2007.

**{¶35}** Then Caulton filed a motion to suppress and request for hearing on March 27, 2007. On April 23, 2007, Caulton filed a third motion to continue trial. Caulton's suppression hearing was set for April 26, 2007. Due to the court's unavailability, the

suppression hearing was rescheduled for May 23, 2007. "R.C. §2945.72(H) permits the tolling of the speedy trial time when a trial court issues a sua sponte continuance as long as the continuance is reasonable." *State v. Driver*, 7th Dist. No. 03 MA 210, 2006-Ohio-494, at ¶14.

**{¶36}** Based on the above, the State correctly calculates that only 69 days had elapsed on Caulton's speedy trial clock from the time Caulton was arrested in Mahoning County on October 31, 2006, until the suppression hearing was held on April 25, 2007. Ultimately, the trial court did not rule on the motion to suppress until 304 days after it was filed (252 days after the hearing). In the interim, on October 4, 2007, while the suppression motion was pending, but after it had been heard, Caulton filed a motion to dismiss on speedy trial grounds which the trial court did not rule on until January 25, 2008 (113 days later).

**{¶37}** The crux of Caulton's speedy trial argument is that the trial court's delay in ruling on both the motion to suppress and the motion to dismiss were unreasonable. The Ohio Supreme Court has held that a trial court does not have "unbridled discretion concerning the amount of time it takes to rule on a defense motion. * * * A strict adherence to the spirit of the speedy trial statutes requires a trial judge, in the sound exercise of his judicial discretion, to rule on these motions in as expeditious a manner as possible." *State v. Martin* (1978), 56 Ohio St.2d 289, 297, 384 N.E.2d 239. Stated otherwise, "the extension of time to rule on a defendant's motion to suppress is subject to a requirement of reasonableness." *State v. Arrizola* (1992), 79 Ohio App.3d 72, 76, 606 N.E.2d 1020. See, also, *State v. Santini* (2001), 144 Ohio App.3d 396, 403, 760 N.E.2d 442 (Seventh District) (adopting the reasonableness requirement for speedy trial purposes in assessing the delay necessary in ruling on a defendant's motion.)

**{¶38}** In assessing the reasonableness of a delay, this court has held that a balancing should be employed in which a court should weigh the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 404, quoting *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101. A court should also specifically consider the nature of the motion

filed and the timing of said motion in assessing whether a delay is reasonable. *Santini* at 404.

**{¶39}** Regarding the length and reason for the delay in this case, the 252-days which elapsed was largely due to the sudden retirement of the original trial judge who presided over the suppression hearing without issuing a ruling, and necessitated a transfer of the case to three other judges before the trial court ultimately issued a ruling. This delay cannot be attributed to Caulton. Regarding the nature of the motion, the issues appear moderate in their complexity. The first issue involved a custodial interrogation where the detective prodded Caulton to continue with the interrogation after he attempted to end it several times, and the trial court granted suppression of the interrogation. The second issue involved two pretrial identifications of Caulton, which solely challenged the credibility of the witnesses. As discussed in more detail below, Caulton did not argue that the photo arrays were impermissibly suggestive, and the trial court denied suppression. Despite the fact that the trial court and not Caulton caused the delay, based on the totality of the circumstances, the trial court's delay in ruling on the suppression motion was not unreasonable.

**{¶40}** Moreover, there was an interim tolling event: Caulton's motion to dismiss. The trial court took 113 days to issue a ruling on that motion and this delay was reasonable. The motion to dismiss was filed on October 4, 2007, and the next day the newly appointed trial judge, having been a prosecutor previously, recused upon Caulton's oral motion. On November 2, 2007, the case was assigned to the fourth trial judge, and on November 5, 2007, Caulton filed a motion for a new evidentiary hearing for his suppression motion. The trial court held a hearing on both that request and the motion to dismiss on January 24, 2008, ruled from the bench and issued a judgment entry to that effect the next day. The motion to dismiss was handled as expeditiously as possible given the circumstances and therefore the delay was not unreasonable.

**{¶41}** Even assuming that the time from the suppression hearing until the court's ruling on the suppression motion was unreasonable and counted against the State, the motion to dismiss, filed in the interim, still tolled the clock long enough so that less than

270 days had elapsed when Caulton executed his speedy trial waiver on February 11, 2008. As discussed above, as of the date of the suppression hearing on May 23, 2007, 69 days elapsed on the speedy trial clock. An additional 133 days elapsed thereafter through October 4, 2007 when Caulton filed his motion to dismiss for a speedy trial violation. This tolled the speedy trial clock until the trial court issued its ruling on that motion and the original motion to suppress on January 25, 2008. Thereafter, an additional 17 days elapsed on the speedy trial clock until Caulton executed a speedy trial waiver on February 11, 2008. Thus, only 219 days had run on Caulton's speedy trial clock.

{¶42} Even assuming that the delay in ruling on the suppression motion was unreasonable, and assuming that *none* of the time the court took to rule on that particular motion tolled the speedy trial clock, Caulton's speedy trial rights were not violated. The motion to dismiss was a separate tolling event, and according to the calculations above, when accounting for that tolling event, only 219 days had elapsed at the time Caulton executed his speedy trial waiver. For all of these reasons, Caulton's first assignment of error is meritless.

**Failure to Conduct New Suppression Hearing**

{¶43} In his second assignment of error, Caulton asserts:

{¶44} "The trial court erred to the prejudice of Appellant and violated his right to due process under the Fourteenth Amendment when the trial court refused to conduct a new suppression hearing before ruling on Appellant's motion using testimony from a previous hearing."

{¶45} Since the trial court ultimately granted the motion to suppress Caulton's statement to police on Miranda grounds, the remaining issue is whether the trial court erred by failing to conduct a new hearing on the motion to suppress the pretrial identifications, and resolving the motion by reviewing the transcript of the hearing. While there is no case law analyzing this precise issue, it is well-established that the trial court acts as a fact-finder during a suppression hearing, and its role in part is to determine credibility issues, which are difficult to determine from a "cold record." See *State v.*

*Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583: "it is fundamental that the weight of the evidence and credibility of witness [sic] are primarily for the trier of the facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212 [39 O.O.2d 366], paragraph one of the syllabus. This principle is applicable to suppression hearings as well as trials." *Fanning* at 20. See, also, *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

**{¶46}** In support of his argument that the trial court erred by failing to conduct a new suppression hearing, Caulton cites *Welsh v. Brown-Graves Lumber Co.* (1978), 58 Ohio App.2d 49, 389 N.E.2d 514, and *Vergon v. Vergon* (1993), 87 Ohio App.3d 639, 622 N.E.2d 111. These two cases are distinguishable because they involved bench trials, where witness credibility is critical to the trier of fact's resolution of the case. By contrast, the sole basis for Caulton's suppression motion was the believability of the witnesses' identification of him *at the scene*, which can only be challenged at trial. Caulton did not challenge the procedure followed by the State when presenting the photo array to the witnesses. Thus, the credibility, or lack thereof, of the witnesses at the suppression hearing would not have changed the outcome of the proceeding.

**{¶47}** This is so because in order to suppress a pretrial identification the defense must also prove that the identification procedure itself was impermissibly suggestive. See *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, at ¶40: "Pretrial identifications may be suppressed only if they are both unnecessarily suggestive and unreliable under the totality of the circumstances.") Thus, where the defense fails to prove that the identification procedure was suggestive, "it is unnecessary * * * to discuss whether the identifications were unreliable under the totality of the circumstances." Id. at ¶56. Further, "[c]onvictions based on eyewitness identifications at trial following pretrial identification by photograph will be set aside [on appeal] only if the photographic identification procedure was so impermissibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification." *State v. McGee*, 7th Dist. No. 07 MA 137, 2009-Ohio-6397, at ¶18.

**{¶48}** In this case, the defense put on no evidence that the identification procedures used by the Youngstown police, to wit, a photo array, were impermissibly

suggestive. Instead, the defense focused on the alleged unreliability of the identifications due to pretrial publicity. That alone would not have mandated suppression of the identifications, but rather would have affected the weight of the witness testimony at trial.

**{¶49}** Thus, assuming arguendo the suppression witnesses were lacking in all credibility, and in fact viewed extensive media coverage of the proceedings, the trial court would have nonetheless denied the suppression motion and allowed the identifications in at trial. It is at trial that credibility of witnesses becomes a subject for the jury to decide. In light of this, the trial court's failure to conduct a new suppression hearing was not erroneous. Accordingly, Caulton's second assignment of error is meritless.

**Manifest Weight**

**{¶50}** In his third assignment of error, Caulton asserts:

**{¶51}** "The trial court denied Appellant due process under the Fourteenth Amendment due to the fact his conviction for murder with a firearm specification were [sic} against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial."

**{¶52}** Although this assignment of error contains some language regarding sufficiency, the crux of Caulton's argument is that his murder conviction is against the manifest weight of the evidence; i.e., he argues that witness testimony was inconsistent, unreliable and not credible. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph two of the syllabus. "Sufficiency of the evidence" is " 'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." ' Id. at 386, quoting Black's Law Dictionary (6th Ed.1990) 1433.

**{¶53}** In contrast, "[w]eight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) Id. A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. Id. This is so because the triers of

fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

**{¶54}** To determine whether a verdict is against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

**{¶55}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the factfinder lost its way.' " *State v. Pallai*, 7th Dist. No. 07 MA 198, 2008-Ohio-6635, at ¶31, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, at ¶81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002-Ohio-1152, at ¶13, citing *State v. Gore* (1999), 131 Ohio App.3d 197, 201, 722 N.E.2d 125.

**{¶56}** Here, Caulton was convicted of murder, pursuant to R.C. 2903.02(A) which states: "[n]o person shall purposely cause the death of another * * *." Caulton argues his conviction was against the manifest weight because witness testimony was unreliable and conflicting. As to unreliability, Caulton focuses his argument on the fact that Caulton's name, alias and photograph were released to the media soon after the shooting, but before any witness identified him in the photo array. He contends that this rendered any witness identification unreliable and his conviction was against the weight of the evidence.

**{¶57}** While an identification witness' viewing of news media reports about the defendant *could* render his or her identification less reliable, there is no evidence of this occurring in the present case. Denise Leonard, who testified that she saw the two men

tussling on a landing in the bleachers and then saw a gun in Caulton's hand was familiar with Caulton *before* the shooting. There was nothing in her *trial* testimony to indicate that her identification of Caulton was influenced by news accounts.

**{¶58}** Further, Christopher Thomas, the other eyewitness who was able to identify Caulton, had a substantial opportunity to view the shooter as the crime took place. While shielding his daughter behind him, Thomas got a direct view of the shooter's face as the incident unfolded. He was able to provide police with an immediate description of the shooter. Then, upon arriving home, Thomas prepared a detailed diagram of the crime scene, which he later duplicated during his interview with police.

**{¶59}** Prior to the shooting Thomas was not familiar with Caulton and there is no indication in the record that he was influenced by pretrial publicity prior to choosing Caulton in the photo array. He did overhear the name "Tone Phiffe," mentioned in his workplace as a possible suspect, and in turn wrote that down on his diagram, which he later provided to police. But there is no indication that he knew which photo was "Tone Phiffe," when he viewed the photo array and identified Caulton (aka Phiffe) as the shooter. Det. Kelty determined that Thomas was a reliable witness before showing him the photo array, and noted that Thomas' statement was consistent with the physical evidence, namely the wounds on the victim. For all of these reasons, the eyewitness testimony was not inherently unreliable.

**{¶60}** Nor do minor conflicts in witness testimony render Caulton's conviction against the manifest weight of the evidence. For example, Caulton makes much of the fact that eyewitness testimony regarding the precise number of shots fired was inconsistent. Yet everyone testified that the scene following the shooting was chaotic, and all of the witnesses with the exception of Thomas were admittedly preoccupied with trying to flee or protect nearby children. The fact that the witnesses either could not recall exactly how many shots were fired, or recalled incorrectly, does not render other aspects of their testimony unreliable. Witness testimony regarding the shooting was overall very consistent; resolving any minor inconsistencies among the witness testimony fell within the province of the jury. See *State v. Hurst*, 181 Ohio App.3d 454, 2009-Ohio-983, 909

N.E.2d 653: "The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. 'While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'" Id. at ¶99 (citations omitted).

{¶61} In sum, the jury did not lose its way so as to create a manifest miscarriage of justice. Rather, the weight of the evidence supports the conviction. Accordingly, Caulton's third assignment of error is meritless.

### Failure to Instruct Jury on Manslaughter

{¶62} In his fourth and final assignment of error, Caulton asserts:

{¶63} "The trial court erred to the prejudice of the Appellant by failing to give proper instructions to the jury regarding the lesser included instruction for voluntary manslaughter when evidentiary testimony adduced at trial warranted said instruction."

{¶64} An appellate court reviews a trial court's decision to give or not to give a particular jury instruction under an abuse of discretion standard. *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, at ¶103. An abuse of discretion connotes more than an error of law or judgment; it implies an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶65} Voluntary manslaughter is an inferior offense of murder, not a lesser included offense; *State v. Kanner*, 7th Dist. No. 04 MO 10, 2006-Ohio-3485, at ¶17, citing *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272, because the elements of the crime of voluntary manslaughter are contained within the offense of murder, except for one or more additional mitigating elements. Id. "Nonetheless, when determining whether an instruction on voluntary manslaughter should have been given, we apply the same test utilized when determining whether an instruction on a lesser-included offense should have been given." *State v. Lewers*, 5th Dist. No. 2009 CA 00289, 2010-Ohio-5336, at ¶100, citing *Shane*, supra at 632.

{¶66} In order to include an instruction for the inferior degree offense of voluntary

manslaughter, the evidence presented at trial must "reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." Id. The trial court is required to consider the facts of the case and evaluate the evidence in the light most favorable to the defendant. *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303. Thus, a reviewing court must determine whether sufficient evidence was presented at trial relative to the voluntary manslaughter offense in order to warrant its inclusion in the instructions to the jury. In order to be entitled to an instruction, a defendant must show that there is more than "some evidence" meriting such an instruction. *Shane* at 632.

**{¶67}** Murder is defined as, inter alia, "purposely caus[ing] the death of another." R.C. 2903.02(A). In contrast, voluntary manslaughter is defined as knowingly causing the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A).

**{¶68}** In order to warrant an instruction on voluntary manslaughter, the defendant must prove by a preponderance of the evidence that there was a provocation by the victim, that the provocation was severe enough to inflame even an ordinary person into using deadly force, and that the defendant was so inflamed. *State v. Mack* (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328; *Shane* at 634. The defendant's burden contains both an objective and a subjective element. Objectively, "[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. And to subjectively determine whether the provocation by a victim was sufficient to provoke the use of deadly force in a particular case, "the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *State v. Deem* (1988), 40 Ohio St.3d 205, 211, 533 N.E.2d 294, quoting *State v. Mabry* (1982), 5 Ohio App.3d 13, 5 OBR 14, 449 N.E.2d 16, paragraph five of the syllabus.

**{¶69}** Further, as this court has previously explained in *State v. Kanner*, 7th Dist. No. 2006-Ohio-3485:

{¶70} "[A]ny passion or rage felt by an offender who has had time to cool off does not qualify for 'sudden passion' or 'sudden fit of rage' under the current voluntary manslaughter statute. The caselaw dealing with the "cooling off" period indicates that it is a very short time span. * * *

{¶71} "In the past, we have recognized that the few seconds it takes to reload or readjust one's weapon indicates a sufficient cooling off period: 'the fact that Appellant shot the victim in the head and then stood over the victim and shot him multiple times after that tends to show cool deliberation and not sudden passion.' *State v. Shakoor*, 7th Dist. No. 01CA121, 2003-Ohio-5140, ¶105; see also *State v. Crago* (1994), 93 Ohio App.3d 621, 644, 639 N.E.2d 801." *Kanner* at ¶28-29 (some internal citations omitted.)

{¶72} Here the evidence of provocation was scant. Danielle Howard testified that she saw the victim "throw up his hands, like let's fight," and there was testimony from several witnesses about scuffling or "tussling" between the two men before the gunshots. However, as indicated, in order to be entitled to an instruction, a defendant must show that there is more than "some evidence" meriting such an instruction. *Shane* at 632. Moreover, the fact that Caulton shot Jones several times, walked away, and then returned to "finish him off," shooting him several more times, seems to demonstrate cool deliberation, not sudden passion.

{¶73} The facts of this case do not reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. Thus, the trial court did not abuse its discretion when it declined to instruct the jury on the offense of voluntary manslaughter. Accordingly, Caulton's fourth assignment of error is meritless.

{¶74} In sum, Caulton's speedy trial rights were not violated; taking into consideration the tolling events, less than 270 days elapsed between his arrest in Mahoning County and his execution of a speedy trial waiver. Second, the trial court did not err by failing to conduct a new suppression hearing before the successor judge; Caulton only challenged the credibility of the witnesses' identification at the scene, which is properly tested at trial, he did not challenge the propriety of the photo array. Third, by convicting Caulton of murder the jury clearly did not lose its way so as to create a

manifest miscarriage of justice. Finally, because the facts of this case do not reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter, the trial court properly and reasonably declined to instruct the jury on the offense of voluntary manslaughter. Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Donofrio, J., concurs.