[Cite as *State v. Gartrell*, 2014-Ohio-5203.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 9-14-02

    v.

CURTIS LEE GARTRELL,             O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 13-CR-0162

**Judgment Affirmed**

Date of Decision: November 24, 2014

APPEARANCES:

    *Brian G. Jones* for Appellant

    *Brent Yager* for Appellee

**PRESTON, J.**

{**¶1**} Defendant-appellant, Curtis Lee Gartrell ("Gartrell"), appeals the December 18, 2013 judgment entry of sentence of the Marion County Court of Common Pleas. He argues that the trial court erred by denying his motion to suppress, that his convictions were based on insufficient evidence and against the manifest weight of the evidence, and that the trial court erred by overruling his motion to dismiss the counts against him based on a speedy-trial violation under R.C. 2945.71. For the reasons that follow, we affirm.

{**¶2**} On April 10, 2013, the Marion County Grand Jury indicted Gartrell on Count One of trafficking in heroin in violation of R.C. 2925.03(A)(2), (C)(6), a second-degree felony, with a forfeiture specification under R.C. 2941.1417. (Doc. No. 3). The indictment stemmed from a March 26, 2013 traffic stop of a taxi cab in which Gartrell was a passenger. (*See* Doc. No. 21). During the stop, Gartrell admitted to having a bag of marijuana in his pocket and consented to a search of his luggage in the trunk, in which officers discovered 499 bindles of heroin. (*See id.*). Gartrell also had over $1,700 cash on his person. (*See id.*).

{**¶3**} The trial court held an arraignment hearing on April 15, 2013. (*See* Doc. No. 9). Gartrell entered a plea of not guilty. (*Id.*).

{**¶4**} On April 17, 2013, Gartrell filed a "request for discovery" and a "request by defendant for notice of prosecutor's intention to use evidence." (Doc.

Nos. 11, 12).  Also on April 17, 2013, Gartrell filed a request for a bill of particulars.  (Doc. No. 10).

{¶5} On April 25, 2013, the trial court set a trial date of June 25, 2013.  (Doc. No. 18).

{¶6} On May 3, 2013, Gartrell filed a "motion for extension of time to file motion to suppress."  (Doc. No. 19).

{¶7} On May 6, 2013, plaintiff-appellee, the State of Ohio, filed its "response to discovery, request for discovery, notice of intention to use evidence, and notice of intent to impeach with crimes older than ten years."  (Doc. No. 20).  Also on May 6, 2013, the State filed a bill of particulars.  (Doc. No. 21).

{¶8} On May 8, 2013, the trial court granted Gartrell's motion for an extension of time to file a motion to suppress, ordering that Gartrell file his motion to suppress by May 28, 2013.  (Doc. No. 22).

{¶9} On May 28, 2013, Gartrell filed a "motion to suppress and exclude evidence."  (Doc. No. 23).  In it, Gartrell moved for the suppression of evidence related to "[t]he stop of the vehicle [Gartrell] was in," "[a]ny statements and comments made by [Gartrell]," "[a]ny and all evidence seized from the vehicle," and "[a]ny and all evidence seized from [Gartrell's] person."  (*Id.*).  Gartrell argued that officers "did not have lawful cause to detain and arrest" him, that he "never knowingly consented to a search," that the search of him "was performed

illegally," that he made his statements while he "was under custodial arrest" and before being read his *Miranda* warnings, and that his statements were obtained in violation of his constitutional rights. (*Id.*).

{¶10} On June 4, 2013, Gartrell moved to continue the jury trial scheduled for June 25, 2013. (Doc. No. 36).

{¶11} On June 10, 2013, the trial court held a hearing on Gartrell's motion to suppress. (June 10, 2013 Tr. at 4). The taxi-cab driver was not present to testify on June 10, 2013, so counsel for Gartrell requested an opportunity to locate him so that he could testify. (*Id.* at 4-5, 109). At Gartrell's counsel's request, the trial court continued the hearing until June 27, 2013, at which time Gartrell offered the testimony of the cab driver. (June 27, 2013 Tr. at 3-5); (Doc. No. 38). At the conclusion of the hearing, the trial court took Gartrell's motion to suppress under advisement. (June 27, 2013 Tr. at 19). Gartrell filed a written closing argument on July 8, 2013. (Doc. No. 42).

{¶12} On July 18, 2013, the trial court filed an entry overruling Gartrell's motion to suppress and exclude evidence. (Doc. No. 43).

{¶13} On July 31, 2013, the trial court set a new trial date of September 24, 2013. (Doc. No. 44).

{¶14} On September 9, 2013, Gartrell's counsel filed a motion to withdraw from representing Gartrell. (Doc. No. 45). On September 12, 2013, the trial court

set Gartrell's counsel's motion for hearing on September 16, 2013. (Doc. No. 46). On September 18, 2013, the trial court granted Gartrell's counsel's motion to withdraw, appointed new counsel to represent Gartrell, and continued the trial. (Doc. No. 47). In its entry, the trial court explained, "Time tolled for speedy trial purposes pursuant to the provisions of R.C. 2945.72(H)." (*Id.*).

{¶15} On October 3, 2013, Gartrell filed a "demand for discovery," a "demand for testimony and independent laboratory analysis," a "response to the State of Ohio's demand for discovery," and a "request for notice of intent to use evidence." (Doc. Nos. 50, 51, 52, 53).

{¶16} On October 11, 2013, the trial court set a new trial date of November 14, 2013. (Doc. No. 54).

{¶17} On October 29 and 31 and November 6, 2013, Gartrell requested that the clerk of courts issue subpoenas duces tecum to two employees of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), Scott Dobransky ("Dobransky") and Larry Rentz ("Rentz").[1] (Doc. Nos. 55, 57, 63).

{¶18} On November 1, 2013, the State filed a supplemental response to Gartrell's discovery requests. (Doc. No. 59).

{¶19} On November 7, 2013, the State filed a superseding indictment, indicting Gartrell on: Count One of trafficking in heroin in violation of R.C.

---

[1] In his October 31 and November 6, 2013 filings, Gartrell requested that the clerk of courts issue subpoenas duces tecum to Rentz. Unlike the October 31, 2013 request, however, the November 6, 2013 request included a list of requested documents. (*Compare* Doc. No. 57 *with* Doc. No. 63).

2925.03(A)(2), (C)(6), a second-degree felony; and Count Two of possession of heroin in violation of R.C. 2925.11(A), (C)(6), a second-degree felony. (Doc. No. 65). The superseding indictment also included a forfeiture specification under R.C. 2941.1417 to Counts One and Two. (*Id.*).

{¶20} Also on November 7, 2013, Gartrell filed a "motion and proposed order for discovery sanctions" under Crim.R. 16(K). (Doc. No. 70). Gartrell requested that the trial court prohibit the State from calling Rentz as a witness and from introducing his written report, arguing that the State failed to timely produce Rentz's name and written report. (*Id.*). Alternatively, Gartrell requested that the trial court continue the trial set for November 14, 2013. (*Id.*).

{¶21} On November 8, 2013, the trial court set a "motion hearing" on November 12, 2013. (Doc. No. 72).

{¶22} Also on November 8, 2014, the State filed a response to Gartrell's motion for discovery sanctions. (Doc. No. 73).

{¶23} On November 12, 2013, the trial court arraigned Gartrell on the superseding indictment, and Gartrell entered pleas of not guilty. (Doc. No. 74).

{¶24} On November 21, 2013, the trial court set a new trial date of December 3, 2013. (Doc. No. 80).

{¶25} The next day, the trial court overruled Gartrell's motion for discovery sanctions but granted his motion for a continuance of the trial. (Doc. No. 81).

{¶26} On December 3, 4, and 5, 2013, the trial court held a jury trial on the superseding indictment. (Trial Tr., Vol. One, at 9-10); (Doc. No. 112). The jury found Gartrell guilty of both counts in the superseding indictment. (Trial Tr., Vol. Five, at 738-741); (Doc. Nos. 109, 110).

{¶27} After the jury returned its verdict, the trial court sentenced Gartrell. (Trial Tr., Vol. Five, at 743). The trial court merged Counts One and Two for purposes of sentencing, and the State elected to proceed with sentencing on Count One. (*Id.* at 774); (Doc. No. 112). The trial court sentenced Gartrell to, among other things, six years in prison and a fine. (*Id.* at 766); (*Id.*). The trial court filed its judgment entry of sentence on December 18, 2013. (Doc. No. 112).

{¶28} On January 17, 2014, Gartrell filed a notice of appeal. (Doc. No. 123). He raises four assignments of error for our review. We will address the second and third assignments of error together.

### Assignment of Error No. I

**Trial court committed reversible error by denying defendant's motion to suppress evidence where officers did not have reasonable suspicion nor [sic] probable cause to follow the vehicle transporting appellant Gartrell; nor did officers have reasonable suspicion nor [sic] probable cause to subsequently initiate a traffic stop of the vehicle, in violation of the Fourth**

**Amendment of the U.S. Constitution and Article I, Section 14 of
the Ohio Constitution. (Tr., Vol. I-III, *passim*.)**

{¶29} In his first assignment of error, Gartrell argues that the trial court erred by denying his motion to suppress because: officers did not have reasonable suspicion or probable cause to follow and stop the taxi cab; one of the officers exceeded the scope of the traffic stop when he immediately questioned Gartrell concerning whether he had marijuana on his person and then searched the taxi cab's trunk; and officers failed to timely inform Gartrell of his *Miranda* rights because he was "effectively in custody from the moment of the stop." (Appellant's Brief at 18).

{¶30} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the

applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶31} In its entry denying Gartrell's motion to suppress, the trial court relied on many facts, all of which were supported by competent, credible evidence presented at the suppression hearing. (*See* July 18, 2013 Entry, Doc. No. 43). At the suppression hearing on June 10, 2013, the State presented the testimony of five law-enforcement officers. At the continuation of the suppression hearing on June 27, 2013, Gartrell offered the testimony of one witness, the taxi-cab driver.

{¶32} The State's first witness was Major Bill Collins ("Collins"), who heads the investigative bureau at the City of Marion Police Department. (June 10, 2013 Tr. at 7). He testified that on March 26, 2013, he was returning to Marion from Columbus, Ohio in his personal vehicle when he noticed a yellow, Columbus-based taxi cab in front of him. (*Id.* at 8-12). Collins became suspicious of the cab and suspected it might contain drugs, so he followed it and called Detective Andrew Isom ("Isom") of the City of Marion Police Department's drug unit. (*Id.* at 11-12). Collins testified that he paced the cab for "about six blocks" and determined that the cab was going 45 miles per hour in a 35-miles-per-hour zone. (*Id.* at 13-14). Collins informed Isom and Detective Dan Ice ("Ice"), who approached in an unmarked vehicle, of the cab's excessive speed and instructed them to stop the cab for speeding. (*Id.* at 14-16). Collins allowed Isom and Ice to

get between his vehicle and the cab. (*Id.* at 14). Collins did not participate in the stop of the cab and instead continued to an appointment he had at the courthouse. (*Id.* at 16).

{¶33} On cross-examination, Collins testified that "it was unusual just to see [the cab] in Marion County period," but once it exited the highway and turned toward the city of Marion, "it heightened [his] suspicion even further." (*Id.* at 21). According to Collins, within the last year, the Ohio State Highway Patrol "stopped a cab coming from Columbus to Marion and got over 1,200 bindles of heroin out of it." (*Id.* at 21-22). That was not one of Collins's cases, but he "was familiar with it." (*Id.* at 22).

{¶34} Isom testified that on March 26, 2013, he was riding with Ice in Ice's unmarked vehicle when Collins called his cell phone and said he was pacing a suspicious cab at approximately 45 miles per hour. (*Id.* at 32-33). According to Isom, he and Ice approached the cab in the opposite direction, turned around, and began to follow the cab, with Collins's vehicle behind them. (*Id.* at 33-34). Isom visually estimated the cab's speed to be "right around 45" miles per hour when he and Ice approached it from the opposite direction. (*Id.* at 34-35). Then, when he and Ice were following the cab, Isom noted that Ice's speedometer read "like 45 or 46" miles per hour and the cab was neither gaining nor losing distance on them— they were "pretty much keeping the same distance," according to Isom. (*Id.*).

Isom testified that he and Ice followed the cab for nine or ten blocks in a 35-miles-per-hour zone, and the cab "never slowed down" and was not stopped by a red light or anything else during that time. (*Id.* at 34-36). Isom has been a police officer in Marion for over 17 years, has served on the drug unit for six or seven of those years, and previously served in the patrol division. (*Id.* at 31).

{¶35} Isom testified that he contacted Christy Utley ("Utley"), a deputy sheriff with the Marion County Sheriff's Office who was in the area in a marked cruiser, and told her to stop the cab for speeding, which she did. (*Id.* at 36-37). Isom and Ice pulled up behind Utley's cruiser, and he noticed two occupants in the cab—the driver and a right-rear passenger, who was later identified as Gartrell. (*Id.* at 37). Isom approached the passenger side of the cab and motioned for the driver to put the passenger window down, which he did. (*Id.* at 38). Isom began a conversation with Gartrell and noticed "a strong odor of [unburnt, raw] marijuana." (*Id.*). Isom testified that based on "[h]undreds and hundreds of cases [involving] marijuana" in which he has participated, his training in the academy, and his years of experience in the drug unit, he is able to distinguish between the odors of burning and unburnt, raw marijuana. (*Id.* at 38-39).

{¶36} Isom testified that he asked Gartrell if he had any marijuana on his person, and Gartrell admitted that he did. (*Id.* at 39). According to Isom, he asked Gartrell to step out of the cab, and Gartrell took the marijuana out of his pocket

and handed it to Isom. (*Id.* at 40). Isom asked Gartrell "if he had anything else on him," and Gartrell said, "[N]o." (*Id.*). Isom asked Gartrell if he minded if Isom checked, and Gartrell said, "[G]o ahead." (*Id.* at 40-41). Isom searched Gartrell's person and found over $1,700 cash in mixed denominations. (*Id.* at 41-42). According to Isom, between the cash and the marijuana, his "suspicions were gettin' up there." (*Id.* at 42).

{¶37} Isom asked Gartrell if "he had any luggage on him," and Gartrell said, "[N]o," despite Gartrell telling Isom earlier that he was from New Jersey and was on his way to his sister's house to visit for more than a week. (*Id.* at 42-43). Isom then asked the cab driver if Gartrell had any luggage, and the driver said, "[Y]eah." (*Id.* at 43). At that point, the driver "popped the trunk" for Isom, the trunk lid came all the way up, and Isom was able to see a suitcase in the trunk. (*Id.* at 44-45). According to Isom, Gartrell told Isom that the luggage was his. (*Id.* at 45). Isom asked Gartrell if he could look in Gartrell's luggage, and Gartrell responded, "Yes." (*Id.* at 46). Isom opened the luggage while it was still in the trunk, began removing clothes, and, when he noticed something that felt odd in the bottom of the suitcase, unzipped the liner of the suitcase. (*Id.* at 46-47, 54-55). Isom testified that at that point, Gartrell "took off running." (*Id.* at 47).

{¶38} Isom ultimately caught up to and physically restrained Gartrell with the help of Ohio State Highway Patrol Trooper Matt Ruth ("Ruth"), who happened

to be conducting a traffic stop nearby. (*Id.* at 47-50). By the time Isom caught up to Gartrell, Ruth had already Tasered Gartrell and caught up to him. (*Id.* at 49). Gartrell was trying to scale a fence once Isom joined Ruth, so Isom "was trying to knock [Gartrell's] arms off the fence because he wouldn't let go of the fence." (*Id.* at 50). According to Isom, Gartrell "eventually came off the fence," and Isom handcuffed Gartrell and read him his *Miranda* rights. (*Id.*). Isom testified that from the time Gartrell fled to the time he was handcuffed, "probably about a minute, minute and a half" elapsed. (*Id.* at 53). Isom could not recall if he asked Gartrell if he understood his rights, but Isom testified that Gartrell did not comment on whether he understood or wanted to invoke his rights. (*Id.* at 52). Isom testified that after reading Gartrell his *Miranda* rights, he asked Gartrell why he ran, and Gartrell said that he ran "[b]ecause he had drugs in his bag." (*Id.* at 51). According to Isom, as he was walking Gartrell back to the patrol cars, Utley said she found "two taped bricks" in Gartrell's suitcase. (*Id.* at 52). Isom asked Gartrell what was in the bricks, and Gartrell said, "[A]bout 500 bindles of heroin." (*Id.*).

{¶39} On cross-examination, Isom testified that in 2000 or 2001, he received training concerning visual speed estimation, but "[b]esides experience," he has not had any training "regarding visual estimation or pacing" since 2001. (*Id.* at 56). Isom testified that Ice was driving the vehicle and that he was a

passenger. (*Id.* at 57). Isom observed Ice's speedometer while Ice followed the cab "the same distance"—"[a] couple car lengths"—for nine or ten blocks. (*Id.* at 57-58). Isom testified that when Utley stopped the cab, she approached the driver. (*Id.* at 58). According to Isom, after Gartrell handed the bag of marijuana to Isom, another officer who arrived at the scene, Marion Police Officer Tim Rowe ("Rowe"), began writing a citation for misdemeanor marijuana possession. (*Id.* at 60-61). Isom did not read Gartrell his *Miranda* rights after Gartrell handed the marijuana to Isom because Gartrell was not under arrest. (*Id.* at 61-62). Isom was aware of the Ohio State Highway Patrol stopping a cab containing heroin within the past couple months, but he was not involved in that case. (*Id.* at 63-64).

{¶40} On re-direct examination, Isom testified that when Gartrell began running, Isom commanded him to stop and did not feel Gartrell was free to leave because even though Gartrell was not under arrest, Isom had not completed his investigation. (*Id.* at 65-66). Isom testified that he arrested Gartrell for obstructing official business. (*Id.* at 66).

{¶41} Utley testified that on March 26, 2013, she was operating a marked cruiser and first learned of the suspicious cab from Collins, who was following the cab, then from Isom. (*Id.* at 68-69). Utley "stay[ed] back until they [gave her] a reason to stop the vehicle." (*Id.* at 69). According to Utley, "[t]hey said they had paced the vehicle going 45 in a 35" miles-per-hour zone. (*Id.*). Utley used her

cruiser's overhead lights to stop the cab, exited her cruiser, informed the cab driver why she stopped him, and asked the driver from where he was coming and for his identification. (*Id.* at 70-71). Utley testified that while she was speaking with the driver, Isom was speaking with the passenger in the rear, passenger-side seat. (*Id.* at 71).

{¶42} Utley testified that at some point during the stop, she joined Isom, who was talking to Gartrell. (*Id.* at 72). According to Utley, Gartrell gave Isom the marijuana on his person and consented to Isom searching his person, at which time Isom found money on Gartrell. (*Id.*). Utley and Rowe began preparing a summons to issue to Gartrell for misdemeanor possession of marijuana. (*Id.* at 72, 74). Utley heard Gartrell deny having any luggage and observed the cab driver respond affirmatively when Isom asked him if Gartrell had any luggage. (*Id.* at 72-73). According to Utley, the cab driver opened the trunk, which she saw contained a couple of bags and a blue suitcase. (*Id.* at 73). Utley testified that Gartrell told Isom, "[Y]eah, go ahead," when Isom asked him if he could search his suitcase. (*Id.* at 74).

{¶43} According to Utley, as Isom was looking in the suitcase, Gartrell "took off running," and Isom and Ice pursued Gartrell on foot. (*Id.*). Utley testified that she stayed at the cab and finished searching the suitcase, in which she initially found two duct-taped packages and then found a third duct-taped package,

all of which appeared to be some sort of drugs. (*Id.* at 75-76). Utley seized the packages as evidence, then drove to where the officers caught Gartrell. (*Id.* at 76). According to Utley, she informed Isom that she found several packages in the suitcase, and when Isom asked Gartrell what was in the packages, Gartrell said, "[A]bout 500 bindles" of heroin. (*Id.*).

{¶44} On cross-examination, Utley testified that she never paced the cab and relied on Isom's statement to her that he paced the cab. (*Id.* at 77). She believed Isom was riding with Ice, but she did not know whether Isom or Ice was driving. (*Id.* at 78). Utley knew Collins paced the cab, but it was Isom who asked her to pull the cab over. (*Id.*). Utley did not smell the odor of marijuana coming from the cab while she was speaking with the cab driver, but she did notice the odor when she went around the vehicle to join Isom while he was speaking with Gartrell. (*Id.* at 80). Utley testified that no one read Gartrell his rights as Utley and Rowe prepared a summons for marijuana possession. (*Id.* at 81). Utley recorded the cab driver's name and the cab's license-plate number and released the driver after giving him a warning. (*Id.*). Before the incident involving Gartrell, Utley did not have knowledge of "Columbus cab companies driving people around" in Marion. (*Id.* at 83).

{¶45} Rowe testified that on March 26, 2013, he stopped to assist the officers in the traffic stop involving the cab and, at Isom's request, began filling

out an affidavit for misdemeanor possession of marijuana. (*Id.* at 86). Rowe testified that he heard Gartrell tell Isom to "go ahead" and search his suitcase. (*Id.* at 87). As Isom was searching the suitcase, Gartrell "took off running," at which point Rowe went back to his car to assist in the chase. (*Id.* at 87-88). Rowe testified that he heard Isom advise Gartrell of his *Miranda* rights after Gartrell had been Tasered and handcuffed, so Rowe radioed the dispatch, "Miranda at this time." (*Id.* at 88-89, 93); (State's Ex. 2). According to Rowe, after Gartrell was read his *Miranda* rights and "somewhere in [the] sequence" of taking the Taser probes off of Gartrell and walking Gartrell back to Rowe's cruiser, Rowe heard Gartrell say "something to the effect, I had 500 bindles." (June 10, 2013 Tr. at 89, 93). Rowe testified that the Taser "probes were stuck in his coat," and in his written report, Rowe noted that "neither [probe] had hit him on his body." (*Id.* at 93); (Defendant's Ex. D).

{¶46} Ruth testified that he joined the pursuit of Gartrell and "deployed [his] taser which knocked him down." (June 10, 2013 Tr. at 101). Ruth "tried to grab a hold of [Gartrell], but due to the snow he rolled, and he got back up and took off running again." (*Id.*). Ruth "then activated the taser again," but Gartrell "still kept running" and jumped onto a fence, at which point Ruth "was able to get around him" and "wrestled" Gartrell to the ground. (*Id.*). In his report, Ruth

stated that Gartrell "continued to resist and tried to get back up" after Ruth took him to the ground. (Defendant's Ex. E).

{¶47} After the State presented its witnesses, the trial court continued the hearing at Gartrell's request so that he could locate the cab driver and present his testimony. (June 10, 2013 Tr. at 110). At the June 27, 2013 continuation of the suppression hearing, Gartrell called the cab driver as a witness. (June 27, 2013 Tr. at 5). The cab driver testified that for a fare of $100, he agreed to take Gartrell from the bus station in Columbus to Marion. (*Id.* at 8-9, 11). According to the driver, after he exited the highway and turned toward Marion, he was not stopped by any red lights before he was stopped by a deputy sheriff. (*Id.* at 11-12). The driver testified that the deputy sheriff approached him and told him that she pulled him over for speeding, and he gave her his driver's license but said nothing in response. (*Id.* at 12-13). When Gartrell's counsel asked him if he was speeding that day, the cab driver responded, "No, I didn't speed." (*Id.* at 12).

{¶48} According to the cab driver, another officer asked him, "[I]s there any suitcase in your trunk?" (*Id.* at 13). The cab driver testified that he responded, "[Y]es," and "popped the trunk." (*Id.*). The cab driver saw Gartrell "[run] from officers," then identified for the deputy sheriff what in the trunk was his and what was Gartrell's. (*Id.* at 14). According to the cab driver, the deputy sheriff took Gartrell's belongings back to her cruiser and told the cab driver he

could go back to Columbus. (*Id.*). The cab driver testified that he did not receive a ticket for speeding or any type of warning. (*Id.* at 14-15).

{¶49} The trial court took the matter under advisement and ultimately denied Gartrell's motion to suppress. (*See* July 18, 2013 Entry, Doc. No. 43). In its entry, the trial court reasoned that it was permissible for Utley to rely on Isom's pace of the cab in stopping the cab, noting that "the information in a radio dispatch can provide the sole basis for an investigatory stop only when the officer who issued the dispatch had a reasonable suspicion justifying the stop." (*Id.* at 2, citing *State v. Goodrich*, 114 Ohio App.3d 645 (3d Dist.1996)). Finding that Isom received "proper training at estimating speed of vehicles" and paced the cab at 45 or 46 miles per hour over a nine or ten-block distance, the trial court concluded that "there was sufficient cause" for Utley to stop the cab based on Isom's radio transmission. (*Id.* at 3). The trial court also found that despite Gartrell's arguments to the contrary, testimony at trial demonstrated that Gartrell consented to the searches of his person and suitcase. (*Id.* at 4). The trial court concluded that Gartrell's statements before and after officers arrested him and read him his *Miranda* rights were admissible because Gartrell was not under custodial arrest "until after being detained at the end of a foot pursuit." (*Id.*).

{¶50} Gartrell's arguments on appeal are similar to those he made to the trial court. He challenges the constitutionality of: the traffic stop, Isom's

"immediately question[ing]" Gartrell after the cab was stopped; the search of the cab's trunk; and the search of Gartrell's suitcase. Gartrell also argues that officers should have read him his *Miranda* rights earlier than they did. Therefore, we must examine the constitutionality of the traffic stop and the searches, as well as the time when Gartrell was under custodial arrest leading to the reading of his *Miranda* rights.

**{¶51}** The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution generally prohibit warrantless searches and seizures, and any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant. *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9; *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12. "Neither the Fourth Amendment to the United States Constitution nor Section 14, Article I of the Ohio Constitution explicitly provides that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment." *Jenkins* at ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

-20-

**{¶52}** "A traffic stop constitutes a seizure and implicates the protections of the Fourth Amendment." *State v. Dillehay*, 3d Dist. Shelby No. 17-12-07, 2013-Ohio-327, ¶ 13, citing *State v. Johnson*, 3d Dist. Hancock No. 5-07-43, 2008-Ohio-1147, ¶ 16. "One exception to the warrant requirement is that a police officer may conduct an investigative stop if there is a reasonable articulable suspicion of criminal activity." *Steinbrunner* at ¶ 13, citing *State v. Keck*, 3d. Dist. Hancock No. 5-03-27, 2004-Ohio-1396, ¶ 11, *State v. Bobo*, 37 Ohio St.3d 177, 179 (1988), and *Berkemer v. McCarty*, 468 U.S. 420, 439-440, 104 S.Ct. 3138 (1984). *See also State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 23. "Notably the threshold is lower to justify an investigatory stop than it is for probable cause to arrest." *Steinbrunner* at ¶ 13, citing *State v. Devanna*, 3d. Dist. Auglaize No. 2-04-12, 2004-Ohio-5096, ¶ 21. *See also Mays* at ¶ 23.

**{¶53}** "The Supreme Court of Ohio has defined 'reasonable articulable suspicion' as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement].'" *State v. Shaffer*, 3d Dist. Paulding No. 11-13-02, 2013-Ohio-3581, ¶ 18, quoting *Bobo* at 178. "In determining whether reasonable articulable suspicion exists, a reviewing court must look to the totality of the circumstances." *Steinbrunner* at ¶ 14, citing *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "Under this analysis, a court should consider 'both the content of

the information possessed by police and its degree of reliability.'" *Id.*, quoting *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999). "A police officer's testimony alone is sufficient to establish reasonable articulable suspicion for a stop." *State v. McClellan*, 3d Dist. Allen No. 1-09-21, 2010-Ohio-314, ¶ 38, citing *State v. Claiborne*, 2d Dist. Montgomery No. 19060, 2002-Ohio-2696.

{¶54} "An officer does not have to have personally observed a traffic violation or criminal activity to justify detaining someone; rather, an officer can rely on information transmitted to him through a dispatch or a flyer." *Steinbrunner*, 2012-Ohio-2358, at ¶ 15, citing *Weisner* at 297. "[W]here a police officer conducts a traffic stop at the request of another officer, it is the knowledge of the requesting officer that determines the presence of articulable suspicion or probable cause[:]

> A police officer need not always have knowledge of the specific facts justifying a stop and may rely, therefore, upon a police dispatch or flyer. * * * This principle is rooted in the notion that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." * * * When a dispatch is involved,

therefore, the stopping officer will typically have very little knowledge of the facts that prompted his fellow officer to issue the dispatch. The United States Supreme Court has reasoned, then, that the admissibility of the evidence uncovered during such a stop does not rest upon whether the officers *relying upon a dispatch or flyer* 'were themselves aware of the specific facts which led their colleagues to seek their assistance.' It turns instead upon 'whether the officers who *issued* the flyer' or dispatch possessed reasonable suspicion to make the stop."

(Emphasis sic.) *McClellan* at ¶ 39, quoting *Weisner* at 297.

**{¶55}** "'A police officer's visual perception that a motor vehicle was speeding, coupled with years of experience, constitutes specific and articulable facts which provide the police officer with reasonable grounds to make an investigatory stop.'" *State v. Hammen*, 5th Dist. Stark No. 2012CA00009, 2012-Ohio-3628, ¶ 27, quoting *State v. Horn*, 7th Dist. Belmont No. 04 BE 31, 2005-Ohio-2930, ¶ 19. *See also State v. Hoder*, 9th Dist. Wayne No. 03CA0042, 2004-Ohio-3083, ¶ 15; *State v. Porter*, 11th Dist. Portage No. 99-P-0061, 2000 WL 1335567, *4 (Sept. 15, 2000). In addition, "'Ohio courts have found that pacing a car is an acceptable manner for determining speed.'" *Hammen* at ¶ 27, quoting *Horn* at ¶ 19. Finally, whether an officer "had an ulterior motive for the traffic

stop * * * is irrelevant to a determination of whether reasonable suspicion existed to initiate the stop." *State v. McGinnis*, 9th Dist. Medina No. 05CA0061-M, 2006-Ohio-2281, ¶ 10, citing *Dayton v. Erickson*, 76 Ohio St.3d 3, 11 (1996).

**{¶56}** "Generally, when investigating a minor traffic violation, a police officer may only detain an individual 'for the length of time necessary to check the driver's license, vehicle's registration, and the vehicle's license plate.'" *Dillehay*, 2013-Ohio-327, at ¶ 15, quoting *State v. Hollins*, 3d Dist. Hancock No. 5-10-41, 2011-Ohio-5588, ¶ 30. "'When a lawfully stopped vehicle contains passengers, the Fourth Amendment permits law enforcement officers to detain those passengers for the duration of the lawful detention of the driver.'" *State v. Fry*, 9th Dist. Summit No. 23211, 2007-Ohio-3240, ¶ 16, quoting *State v. Brown*, 2d Dist. Montgomery No. 20336, 2004-Ohio-4058, ¶ 14. In addition, an officer may request identification from a passenger and order passengers to exit a vehicle pending completion of the stop. *Id.*, citing *State v. Chagris*, 107 Ohio App.3d 551, 556-557 (9th Dist.1995) and *State v. White*, 9th Dist. Wayne No. 05CA0060, 2006-Ohio-2966, ¶ 10. "'[I]f, during the investigation of the events giving rise to the initial stop, the officer discovers additional facts from which it is reasonable to infer additional criminal activity[,] the officer is permitted to lengthen the duration of the stop to investigate such suspicions.'" *Dillehay* at ¶ 15, quoting *Hollins* at ¶ 31.

**{¶57}** "'Once a law enforcement officer has probable cause to believe that a vehicle contains contraband, he or she may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement.'" *State v. Minyoung*, 3d Dist. Van Wert No. 15-11-11, 2012-Ohio-411, ¶ 25, quoting *State v. Moore*, 90 Ohio St.3d 47, 51 (2000). "'[T]he smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement.'" *State v. Runyon*, 12th Dist. Clermont No. CA2010-05-032, 2011-Ohio-263, ¶ 14, quoting *Moore* at 48. "'There need be no other tangible evidence to justify a warrantless search of a vehicle.'" *Id.*, quoting *Moore* at 48.

**{¶58}** "A trunk and a passenger compartment of an automobile are subject to different standards of probable cause to conduct searches." *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 51. "The odor of *burnt* marijuana in the passenger compartment of a vehicle does not, standing alone, establish probable cause for a warrantless search of the trunk of the vehicle." (Emphasis added.) *Id.* at ¶ 52, citing *United States v. Nielsen*, 9 F.3d 1487 (10th Cir.1993). "However, where an officer detects a strong odor of *raw* marijuana, but no large amount is found within the passenger compartment of the vehicle, the officer has probable cause to search the trunk," including the trunk's contents. (Emphasis added.)

*State v. Price*, 6th Dist. Sandusky No. S-11-037, 2013-Ohio-130, ¶ 16, citing *State v. Gonzales*, 6th Dist. Wood No. WD-07-060, 2009-Ohio-168 and *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157 (1982). In addition, even the smell of *burnt* marijuana, if coupled with "other evidence" of drug activity, such as large amounts of cash, can serve as probable cause justifying a search of an automobile's trunk. *Price* at ¶ 19; *State v. Franklin*, 8th Dist. Cuyahoga No. 99806, 2014-Ohio-1422, ¶ 24.

{¶59} Moreover, a vehicle occupant's production of drugs gives an officer probable cause to believe the vehicle contains evidence of contraband. *See State v. Young*, 12th Dist. Warren No. CA2011-06-066, 2012-Ohio-3131, ¶ 33. *See also City of Westlake v. Gordon*, 8th Dist. Cuyahoga No. 100295, 2014-Ohio-3031, ¶ 17 ("[T]he criminal tool establishing probable cause that a crime occurred or was occurring was retrieved by a passenger of the car and turned over to the officer, justifying the warrantless search of the vehicle."); *United States v. Deysie*, D.Ariz. No. CR-14-8112-001-PCT-G, 2014 WL 3887873, *4 (Aug. 7, 2014) ("An officer with probable cause can search the entire car for contraband. * * * [A] person stopped by officers cannot preempt a search and remove probable cause by volunteering some contraband to the officer. * * * [The officer] did not have to accept [the defendant's] claim that all of his marijuana was in the bag he handed over.").

**{¶60}** Aside from probable cause, proper consent can serve as a basis for an officer to lawfully search a vehicle. "'[A] search of property without a warrant or probable cause but with proper consent having been voluntarily obtained does not violate the Fourth Amendment.'" *State v. Hartman*, 9th Dist. Summit No. 26250, 2012-Ohio-4694, ¶ 12, quoting *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 98. "'The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.'" *State v. White*, 3d Dist. Allen No. 1-13-27, 2014-Ohio-555, ¶ 39, quoting *Roberts* at ¶ 99. "'The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect.'" *State v. Graziani*, 3d Dist. Defiance No. 4-10-01, 2010-Ohio-3550, ¶ 20, quoting *Roberts* at ¶ 99. To rely on the consent exception of the warrant requirement, the State must show by clear and positive evidence that the consent was freely and voluntarily given. *State v. Elam*, 3d Dist. Hancock No. 5-02-57, 2003-Ohio-1577, ¶ 19, citing *State v. Posey*, 40 Ohio St.3d 420, 427 (1988).

**{¶61}** Regarding *Miranda*, a suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602 (1966). *See also State v. Billenstein*, 3d Dist. Mercer No. 10-13-10, 2014-Ohio-255, ¶ 37, quoting *Miranda* at 479. "Absent such a warning, a suspect's statements during a custodial interrogation are subject to suppression." *Billenstein* at ¶ 37, citing *State v. Kirk*, 3d Dist. Crawford No. 3-12-09, 2013-Ohio-1941, ¶ 24.

{¶62} "'In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave.'" *Id.* at ¶ 38, quoting *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27. "The first inquiry is distinctly factual." *Id.*, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995).

{¶63} "'Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Id.*, quoting *Hoffner* at ¶ 27. "The subjective views harbored by either the interrogating officers or the person being questioned are of no consequence in the *Miranda* analysis." *Id.*,

citing *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994). "In resolving the ultimate inquiry, courts must consider the totality of the circumstances surrounding the questioning." *Id.*, citing *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995) and *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983).

{¶64} "The temporary detention involved in a traffic stop, however, is not considered 'custody' triggering the *Miranda* protections of Fifth Amendment rights." *State v. Jolly*, 2d Dist. Montgomery No. 22811, 2008-Ohio-6547, ¶ 13, citing *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138 (1984). "General, on-the-scene questioning of persons concerning events that have happened does not ordinarily fall within the ambit of custodial interrogation, because the compelling atmosphere inherent in the process of in-custody interrogation is not present." *State v. Engle*, 2d Dist. Montgomery No. 25226, 2013-Ohio-1818, ¶ 26, citing *State v. Barnett*, 2d Dist. Montgomery No. 14019, 1994 WL 567551, *4 (Aug. 31, 1994). "Similarly, the roadside questioning of a motorist detained pursuant to a routine traffic stop does not ordinarily constitute custodial interrogation for purposes of *Miranda*." *Id.*, citing *Barnett* at *4. *See also State v. Surgener*, 3d Dist. Crawford Nos. 3-94-27 and 3-94-29, 1995 WL 141519, *3 (Mar. 23, 1995). "Simply asking the motorist in that circumstance to sit in the rear of the police cruiser for a short period of time while answering a few questions or

while a citation is issued does not convert the ordinary traffic stop into custodial interrogation." *Engle* at ¶ 26, citing *Barnett* at \*4. *See also State v. Keene*, 7th Dist. Mahoning No. 08 MA 95, 2009-Ohio-1201, ¶ 17 ("The fact that the motorist is not free to go until they have been cited for the traffic stop does not turn the question into a custodial interrogation.").

**{¶65}** "Statements voluntarily made after the *Miranda* warnings have been given to a defendant are admissible in evidence." *State v. Price*, 8th Dist. Cuyahoga No. 98410, 2013-Ohio-1542, ¶ 23, citing *State v. Osborne*, 50 Ohio St.2d 211 (1977). "A suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Asp*, 5th Dist. Guernsey No. 2010-CA-40, 2011-Ohio-4567, ¶ 39, citing *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851 (1987). "A trial court, in determining whether a statement was made voluntarily, and whether defendant knowingly and voluntarily waived his *Miranda* rights prior to giving a statement, should consider the totality of the circumstances * * *." *State v. Jones*, 3d Dist. Van Wert No. 15-11-16, 2012-Ohio-5334, ¶ 23, citing *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 57. *See also State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 14 ("An understanding waiver of *Miranda* rights may be inferred from the totality of the circumstances."). These circumstances include

"the age, mentality, and prior criminal experience of the defendant; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Jones* at ¶ 23, citing *Brinkley* at ¶ 57. "[T]he state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34, citing *Miranda*, 384 U.S. at 475 and *Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515 (1986).

{¶66} We begin our analysis by examining whether Isom, on whose dispatch Utley relied in stopping the taxi cab, had a reasonable, articulable suspicion that the cab driver committed a traffic violation. The trial court concluded that Isom "received proper training as to speed detection" and that "Utley made her stop based upon the speed pace of Detective Isom, which information had been transmitted to her by radio." (July 18, 2013 Entry, Doc. No. 43, at 2). Indeed, Isom testified that he twice estimated that the cab was traveling in excess of the posted speed limit. Specifically, he visually estimated the speed of the cab at 45 miles per hour, in excess of the 35-miles-per-hour speed limit, as he and Ice approached the cab from the opposite direction. Once they turned around and were following the cab, Isom observed the cab travel for an uninterrupted, nine or ten-block distance, during which time he and Ice maintained the same distance behind the cab and traveled at a speed of 45 or 46 miles per

hour, again in excess of the speed limit. Isom was trained in 2000 or 2001 on visual speed estimation and has served in the drug unit and patrol division in his 17 years as a Marion police officer. Isom radioed Utley to inform her of the cab's traffic violation, and Utley heard Isom's radio transmission and stopped the cab based on Isom's estimation of the cab's excessive speed.

{¶67} We conclude that these facts satisfy the applicable legal standard governing the stop of the cab. Isom's visual perception that the cab was speeding and his pace of the cab, coupled with his training and years of experience, constituted specific and articulable facts giving rise to a reasonable, articulable suspicion that the cab driver committed a traffic violation. *See Hammen*, 2012-Ohio-3628, at ¶ 27. Isom possessed a reasonable, articulable suspicion justifying a stop of the cab, and he communicated that reasonable, articulable suspicion to Utley, who received the communication and made the stop based on Isom's reasonable, articulable suspicion. *See McClellan*, 2010-Ohio-314, at ¶ 39. Therefore, Utley's stop of the cab was not unconstitutional.

{¶68} To the extent Gartrell argues that the stop of the cab for speeding was a pretext to investigate the cab's passenger, we reject Gartrell's argument. Any ulterior motives for the traffic stop are irrelevant to the determination of whether the officers possessed a reasonable, articulable suspicion justifying the stop. *See McGinnis*, 2006-Ohio-2281, at ¶ 10, citing *Erickson*, 76 Ohio St.3d at 11. To the

extent Gartrell suggests that evidence should have been suppressed because he was racially profiled, "this Court has rejected racial profiling as a legal basis for the suppression of evidence." *State v. Coleman*, 3d Dist. Hancock No. 5-13-15, 2014-Ohio-1483, ¶ 18, citing *State v. Chambers*, 3d Dist. Hancock No. 5-10-29, 2011-Ohio-1305, ¶ 22 and *United States v. Cousin*, 448 Fed.Appx. 593, 594 (6th Cir.2012).[2]

**{¶69}** We next address Gartrell's argument that Isom exceeded the scope of the stop when he "immediately questioned" Gartrell after Utley stopped the cab. (Appellant's Brief at 14). We concluded above that Utley's stop of the cab was not unconstitutional. To the extent Gartrell argues that his constitutional rights were violated because he was detained in the cab during a traffic stop, we reject his argument because officers may detain passengers of a lawfully stopped vehicle for the duration of the lawful detention of the driver. *Fry*, 2007-Ohio-3240, at ¶ 16. Utley was speaking with the cab driver concerning why she stopped him

---

[2] In support of his assignment of error challenging the trial court's denial of his motion to suppress, Gartrell, at multiple points, cites testimony from trial. However, at the time the trial court ruled on Gartrell's motion to suppress, it had before it only the evidence presented at the suppression hearing. *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 18. "[I]n reviewing a trial court's ruling on a motion to suppress, an appellate court may consider only evidence that was presented during the suppression hearing and may not consider evidence presented at trial." *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 45 (10th Dist.). As the Tenth District Court of Appeals observed in *Monford*, "numerous Ohio appellate courts have * * * based their review only upon evidence presented at the suppression hearing." *Id.* at ¶ 46, citing *State v. Wright*, 7th Dist. Mahoning No. 03 MA 112, 2004-Ohio-6802; *State v. Weese*, 9th Dist. Summit No. 20769, 2002-Ohio-3750; *State v. Tapke*, 1st Dist. Hamilton No. C-060494, 2007-Ohio-5124; *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845 (2d Dist.). *See also id.*, citing *State v. Kinley*, 72 Ohio St.3d 491, 496, fn. 1 (1995). Moreover, while the trial testimony may have become relevant had Gartrell renewed his motion to suppress following the relevant evidence at trial, Gartrell has not directed our attention to anywhere in the record where this was done, nor have we found any. *See Croom* at ¶ 18; *State v. Nixon*, 1st Dist. Hamilton No. C-020428, 2003-Ohio-3384, ¶ 15.

while, in Gartrell's words, Isom began to "immediately question" him. Therefore, the officers' detention of Gartrell did not extend beyond the lawful detention of the driver.

{¶70} The trial court concluded that "once Detective Isom detected the strong odor of marihuana eminating [sic] from the cab, there was sufficient cause for the detective to order the Defendant out of the vehicle." (July 18, 2013 Entry, Doc. No. 43, at 4). Indeed, as Isom was speaking with Gartrell after the cab driver opened the rear, passenger-side window, Isom noticed a "strong odor" of unburnt, raw marijuana—an odor Isom recognized based on his training and experience. At that point, Isom possessed additional facts from which it was reasonable to infer additional criminal activity, and Isom was permitted to lengthen the duration of the stop to investigate his suspicions. *Dillehay*, 2013-Ohio-327, at ¶ 15; *Minyoung*, 2012-Ohio-411, at ¶ 15; *Runyon*, 2011-Ohio-263, at ¶ 13-16. Therefore, Isom's continued detention of Gartrell to investigate the marijuana odor and Isom's questions to Gartrell concerning marijuana did not violate Gartrell's constitutional rights.

{¶71} We next address Gartrell's argument that "Isom's search of the trunk exceeded the scope of the initial stop and any expanded scope provided by the odor of the subsequently surrendered marijuana." (Appellant's Brief at 15). We reject Gartrell's argument. After Isom detected the strong odor of marijuana, he

-34-

asked Gartrell whether he had any marijuana on his person, and when Gartrell said that he did, Isom had Gartrell step out of the vehicle. After Gartrell handed Isom the marijuana that was in his pocket, Gartrell consented to Isom searching him, telling Isom, "[G]o ahead." Isom found a large sum of cash—over $1,700—on Gartrell's person. Gartrell does not contest Isom's asking him to exit the vehicle and Isom's search of his person. Furthermore, despite Gartrell telling Isom that he was from New Jersey and on his way to a more-than-weeklong visit, Gartrell initially denied having any luggage, but the cab driver indicated that he did have luggage.

{¶72} The combination of the "strong odor" of unburnt, raw marijuana, Gartrell's production of marijuana from his pocket, Isom's finding over $1,700 on Gartrell's person, and Gartrell's apparent untruthfulness concerning his luggage created probable cause for Isom to search the cab's interior *and* trunk, *as well as* the contents of the interior and trunk, for contraband. *Price*, 2013-Ohio-130, at ¶ 16-18; *Franklin*, 2014-Ohio-1422, at ¶ 24; *Young*, 2012-Ohio-3131, at ¶ 32-36. Gartrell's voluntary production of the marijuana on his person did not remove this probable cause. *See Deysie*, 2014 WL 3887873, at *4. In addition, Gartrell does not contest the officers' search of his luggage, and the evidence presented at the suppression hearing showed that Gartrell consented to a search of his luggage by responding, "Yes," when Isom asked if he could look in Gartrell's luggage.

**{¶73}** Finally, we address Gartrell's argument that statements he made offend *Miranda* protections. Specifically, Gartrell argues that he was "seized from the moment Det. Utley conducted effected [sic] the traffic stop of the taxi cab" but that "it is the statements elicited after Appellant Gartrell fled and was subdued that most offend the *Miranda* protections." (Appellant's Brief at 16). The trial court concluded that Gartrell's pre-arrest and post-arrest statements were admissible. (July 18, 2013 Entry, Doc. No. 43, at 4). Specifically, the trial court concluded that "before the Defendant ran from the area of the traffic stop, the Defendant was not under arrest, but was being detained while a complaint for minor misdemeanor marihuana possession was being prepared." (*Id.*). The trial court also concluded that Gartrell "was not placed under arrest until he was finally stopped after a foot pursuit," at which time "he was arrested" and "Miranda warnings were administered to the Defendant." (*Id.*). We agree.

**{¶74}** First, Gartrell was not in "custody" for purposes of *Miranda* simply because he was in a vehicle stopped by authorities. *Jolly*, 2008-Ohio-6547, at ¶ 13. Second, Isom's roadside questioning of Gartrell did not amount to a custodial interrogation for purposes of *Miranda*. *Engle*, 2013-Ohio-1818, at ¶ 26; *Surgener*, 1995 WL 141519, at *3. Third, Gartrell's standing by while officers prepared his summons for misdemeanor marijuana possession did not amount to "custody" under *Miranda*. *See Engle* at ¶ 26; *Keene*, 2009-Ohio-1201, at ¶ 17.

{¶75} Nor did Gartrell's statements after he "fled and was subdued" violate *Miranda*. Gartrell, who is African American, argues that the trial court should have suppressed his post-flight statements—particularly his statement that his suitcase contained "about 500 bindles" of heroin—because he was "Tasered into submission" and "assaulted by officers" and because he was handcuffed and surrounded by "multiple Caucasian officers" who "haul[ed] him * * * to the patrol car." (Appellant's Brief at 17). The evidence offered by the State at the suppression hearing demonstrated by a preponderance of the evidence that Gartrell voluntarily waived his *Miranda* rights and made his statements—including the statement concerning the bindles of heroin—voluntarily.

{¶76} Isom testified that with the help of Ruth, he caught up to and physically restrained Gartrell. However, no evidence introduced at the suppression hearing suggests Gartrell's cognitive abilities were adversely impacted by his flight and capture. Notably, despite Gartrell's contention, he was not "Tasered into submission." Rather, he got back up and continued to flee after Ruth deployed the Taser the first time. Ruth's subsequent deployment of the Taser had no effect on Gartrell. Also, despite Gartrell's contention that he was "assaulted by police officers," the evidence introduced at the suppression hearing reveals that officers did not engage in any coercive action for purposes of the *Miranda* analysis. Gartrell was attempting to scale a fence and would not let go

before Ruth and Isom finally got him to release his grip and wrestled him to the ground. Even after the officers wrestled him to the ground, Gartrell continued to resist and attempted to get up. The entire chase and capture lasted only a minute or a minute and a half.

{¶77} After Isom read Gartrell his *Miranda* rights, Isom asked Gartrell why he ran, and, according to Isom, Gartrell responded by stating simply that "he had drugs in his bag." When Isom then asked what was in the two taped bricks that Utley found in Gartrell's suitcase, Gartrell responded, "[A]bout 500 bindles of heroin." Isom asked Gartrell these questions as he was walking him back to the patrol car. The length, intensity, and frequency of the interrogation were therefore minimal. Nor was Gartrell mistreated—the officers did only what they needed to do to capture Gartrell. The record does not reflect that Isom or any other officer threatened or coerced Gartrell or induced him to respond. Gartrell's answers to both of Isom's questions were direct and responsive, suggesting Gartrell's cognition was not impaired. What is more, Gartrell possessed the mental alertness to inform the officers that "[h]e wanted to give up his property to his sister." (June 10, 2013 Tr. at 53). Finally, while the suppression-hearing record does not reveal Gartrell's age or prior criminal experience, the record reflects that Gartrell, who is from New Jersey, had the ability to travel by Greyhound bus to Columbus, then by taxi cab to Marion. (*Id.* at 54). For these reasons, we conclude that the State

proved by a preponderance of the evidence that Gartrell knowingly, voluntarily, and intelligently waived his *Miranda* rights and that he made his statements voluntarily. *See State v. Llanderal-Raya*, 9th Dist. Medina No. 04CA0079-M, 2005-Ohio-3306, ¶ 28-33; *Lather*, 110 Ohio St.3d 270, at ¶ 12, 14.

**{¶78}** The trial court did not err in denying Gartrell's motion to suppress.

**{¶79}** Gartrell's first assignment is overruled.

### Assignment of Error No. II

**Appellant Gartrell's convictions for trafficking and possession of heroin in an amount greater than 100 but less than 500 "bindles" were against the manifest weight of the evidence resulting in a miscarriage of justice, in violation of Section 3, Article IV of the Ohio Constitution, because the manifest weight of the evidence showed Mr. Gartrell possessed at most only 28 "bindles." (Tr., Vol. III, p. 449-491.)**

### Assignment of Error No. III

**Appellant Gartrell's convictions of trafficking and possession were based upon insufficient evidence as the State failed to prove beyond a reasonable doubt that Appellant Gartrell trafficked or possessed more than 28 "bindles," thereby violating the [sic] his rights under the Due Process Clause of the Fourteenth Amendment and Article I, Section 16 of the Ohio Constitution. (Tr., Vol. III, p. 449-491.)**

**{¶80}** In his second and third assignments of error, Gartrell argues that his convictions for trafficking in heroin and possession of heroin were against the manifest weight of the evidence and supported by insufficient evidence. Specifically, Gartrell argues that Rentz, the BCI employee who tested the contents

of the bindles found in Gartrell's suitcase, tested only 28 of the bindles and applied the "hypergeometric sampling" method to conclude with 95 percent likelihood that at least 90 percent of the 499 samples contained heroin.

{¶81} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶82}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶83}** Gartrell was convicted of trafficking in heroin in violation of R.C. 2925.03(A)(2), (C)(6) and possession of heroin in violation of R.C. 2925.11(A), (C)(6). R.C. 2925.03, Ohio's drug-trafficking statute, provides, in part:

No person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows

or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

R.C. 2925.03(A)(2). R.C. 2925.03(C)(6) provides that "[i]f the drug involved in the violation is heroin or a compound, mixture, preparation, or substance containing heroin, whoever violates division (A) of this section is guilty of trafficking in heroin." R.C. 2925.03(C)(6). The degree of the offense depends on the quantity of drugs trafficked, and relevant to Gartrell's case, the statute provides:

Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds one hundred unit doses but is less than five hundred unit doses or equals or exceeds ten grams but is less than fifty grams, trafficking in heroin is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.

R.C. 2925.03(C)(6)(e).

{¶84} R.C. 2925.11, one of Ohio's drug-possession statutes, provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). Similar to the drug-trafficking statute, R.C. 2925.11(C)(6) provides that "[i]f the drug involved in the violation is

heroin or a compound, mixture, preparation, or substance containing heroin, whoever violates division (A) of this section is guilty of possession of heroin." The degree of the offense depends on the quantity of drugs possessed, and relevant to Gartrell's case, the statute provides:

> If the amount of the drug involved equals or exceeds one hundred unit doses but is less than five hundred unit doses or equals or exceeds ten grams but is less than fifty grams, possession of heroin is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.

R.C. 2925.11(C)(6)(d). A "unit dose" under R.C. 2925.03 and 2925.11 "means an amount or unit of a compound, mixture, or preparation containing a controlled substance that is separately identifiable and in a form that indicates that it is the amount or unit by which the controlled substance is separately administered to or taken by an individual." R.C. 2925.01(E).

{¶85} Under his second and third assignments of error, Gartrell disputes only the issues of the quality and quantity of drugs trafficked and possessed. In other words, he does not argue that the State failed to prove the other elements of the drug-trafficking and drug-possession offenses. Therefore, we will limit our review under Gartrell's second and third assignments of error only to the issues of

the quality and quantity of drugs trafficked and possessed. *See State v. Alexander*, 8th Dist. Cuyahoga No. 85688, 2005-Ohio-5200, ¶ 34.

{¶86} At trial, the State offered the testimony of Rentz, a forensic chemist in the drug analysis section of BCI. (Trial Tr., Vol. Three, at 434). Among other qualifications, Rentz testified that he has conducted scientific analysis of suspected controlled substances to determine their weight and identity "[m]any thousands" of times. (*Id.* at 437). He has conducted that analysis on heroin "[p]robably several 100" times. (*Id.*). The BCI lab is accredited. (*Id.* at 439). Without objection from Gartrell, the trial court qualified Rentz as an expert witness concerning scientific analysis of controlled substances, including heroin. (*Id.* at 438).

{¶87} Rentz identified State's Exhibit 13 as including the substance he analyzed for this case—"499 little glassine packets containing a powder substance." (*Id.* at 443). Rentz explained how he handled each packet: "I would weigh the entire bundle or the small packs themselves with the material in them. I then emptied each of the packets out onto a separate piece of paper and then weighed the packets themselves and then subtracted that weight from the total." (*Id.* at 445-446). According to Rentz, he viewed the substance in each packet, and each packet contained substantially the same substance. (*Id.* at 446).

{¶88} After analyzing the substance, Rentz concluded to a reasonable degree of scientific certainty that the 499 bindles, or packets, contained "9.3 grams that have heroin in them." (*Id.* at 447). Rentz recorded the results of his analysis in a laboratory report, which he identified as State's Exhibit 21. (*Id.* at 444, 446-447). Rentz's "Findings" stated in his report are: "Four hundred ninety nine (499) packets containing off white material – 9.3 grams – found to contain Heroin determined using hypergeometric sampling." (State's Ex. 21). Rentz testified that he was not the first person at BCI to analyze the substance—Dobransky analyzed the substance but later retired from BCI. (Trial Tr., Vol. Three, at 448). According to Rentz, the results of his analysis and the results of Dobransky's analysis were the same. (*Id.* at 448-449).

{¶89} On cross-examination, Rentz testified that he used a "Gas Chromatography Mass Spectrometry" ("GCMS") Test to determine whether the substance contained heroin. (*Id.* at 456). He preceded the GCMS Test with a Cobalt Thiocyanate Test, which Rentz admitted "tests for many things" as stated in the applicable "chem manual," none of which are heroin. (*Id.* at 457-458). The Cobalt Thiocyanate Test yielded a positive result. (*Id.* at 458). Rentz admitted that he did not test the substance in all 499 bindles. (*Id.*). Rather, he counted all 499 of the bindles, but he tested the substances in only 28 bindles that he randomly selected out of the 499. (*Id.* at 459, 466). Rentz was not sure if Dobransky tested

the same 28 bindles. (*Id.* at 459). Rentz testified that the random-sampling method he used, hypergeometric sampling, is a statistical method that provides "a reliability factor for the ones we have tested so we can make a statement about the entire sample." (*Id.* at 460). Specifically, the hypergeometric-sampling method uses 6 percent of the total to make a prediction about 100 percent of the total. (*Id.*). Rentz agreed that the hypergeometric sampling method should only be applied if the units "appear to be homogeneous or identical" and that "each unit must be completely tested." (*Id.* at 461). Rentz admitted that Dobransky reached a different result concerning the "ultimate weight" of the substance, which reflected Dobransky's taking some of the substance for testing, according to Rentz. (*Id.* at 464-465).

{¶90} On re-direct examination, Rentz testified that he conducts "different types of preliminary testing" on substances, including the Cobalt Thiocyanate Test, to get "an idea of what might possibly be present." (*Id.* at 477). In this case, Rentz testified that he used preliminary testing to determine that the substance could have been heroin, and then conducted additional testing and determined that the substance was heroin. (*Id.* at 478). Rentz testified that hypergeometric sampling is accepted as a forensic-drug-chemistry method for testing controlled substances. (*Id.*). Rentz reiterated that he opened all 499 packets and observed that each one contained what appeared to be the same substance. (*Id.* at 479). The

contents of all 28 packets that Rentz randomly selected tested positive for heroin. (*Id.*). Rentz reiterated that it was his opinion within a reasonable degree of scientific certainty that the 499 bindles contained heroin. (*Id.*).

{¶91} After counsel concluded their examinations of Rentz, the trial court allowed the jury to submit questions of the witness to the court. (*Id.* at 481-482). One juror asked why Dobransky's test was not "used for evidence," and Rentz explained that when an analyst retires like Dobransky did, it is BCI's policy to retest the substance so that the retired analyst does not have to come back to testify in court. (*Id.* at 483). Another juror asked, "[H]ow can you be sure all the bindles contained heroin if all were not tested?" (*Id.*). Rentz responded, "Very simply, I can't. It's a statistical method. Where we'll use a certain number and say because these all turned out exactly the same, they look the same, they appear to be the same, same consistency we can now make something in a statement about the whole." (*Id.*).

{¶92} Another juror asked why Rentz did not test all 499 packets. (*Id.* at 486). Rentz testified that testing every sample of every case BCI receives would be "quite time consuming," so they use a statistical technique to "say something about the whole based on the random sample." (*Id.* at 486-487). In explaining how he decided to randomly sample 28 of the 499 packets, Rentz testified that in the hypergeometric sampling formula, BCI uses a "threshold of * * * 95 percent

confident that at least 90 percent of the sample is." (*Id.* at 487). Using that threshold, when 499 is "plugged into the formula," it yields a required sample size of 28, according to Rentz. (*Id.*). In response to another juror question, Rentz clarified that he performed the GCMS Test to confirm that the substance in the 28 samples was heroin. (*Id.* at 486). Gartrell did not offer the testimony of an expert witness to counter Rentz's testimony.

{¶93} The State also called Isom, Utley, and Rowe as witnesses. (Trial Tr., Vol. Two, at 219); (Trial Tr., Vol. Three, at 336, 405). Isom testified that when he asked Gartrell why he fled on foot, Gartrell said because "he had drugs in his bag." (Trial Tr., Vol. Two, at 236). According to Isom, he also asked Gartrell what was in the two duct-taped bricks that Utley discovered in Gartrell's suitcase, and Gartrell responded, "[H]eroin." (*Id.* at 237). Isom testified that he "asked him how much," and Gartrell responded, "500 bindles." (*Id.*). Utley testified that she heard Gartrell tell Isom that the duct-taped packages contained "500" of "heroin." (Trial Tr., Vol. Three, at 349). Rowe testified that he heard Gartrell tell Isom that he ran because he had "heroin." (*Id.* at 409). According to Rowe, he also heard Gartrell tell Isom that he had "500" of "heroin." (*Id.*).

{¶94} We first review the sufficiency of the evidence supporting Gartrell's drug-trafficking and drug-possession convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No.

9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). We conclude, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could have found proven beyond a reasonable doubt that the amount of drugs involved equaled or exceeded one hundred unit doses but was less than five hundred unit doses and that the drug was heroin. Rentz—who the trial court qualified as an expert concerning scientific analysis of controlled substances, including heroin—testified that, to a reasonable degree of scientific certainty, the 499 bindles found in Gartrell's suitcase contained heroin. In addition, Isom, Utley, and Rowe testified that Gartrell admitted that he had 500 units of heroin in his suitcase.

{¶95} Gartrell argues that the evidence presented by the State was sufficient to prove trafficking and possession of, at most, 28 bindles of heroin. Gartrell argues that while hypergeometric sampling might be scientifically accepted, that statistical method "must be found insufficient when the testing scientist cannot adequately explain the method nor [sic] its reliability factor." (Appellant's Brief at 24). Gartrell points to Rentz's statement that hypergeometric sampling is "a math formula and I'm not as up on it as I should be." (Trial Tr., Vol. Three, at 487). Gartrell also argues that Rentz admitted that he tested the contents of only 28 of the bindles "and could not account for whether he had fully

inspected the 28 for the requisite homogenous quality required for accurate hypergeometric sampling." (Appellant's Brief at 24).

{¶96} To the extent Gartrell disputes the hypergeometric sampling method and suggests that BCI must test every drug unit to support a conviction, we disagree with Gartrell. Concerning hypergeometric sampling, we agree with the Tenth District Court of Appeals, which has "accepted the hypergeometric or random sampling method of testing and determined 'evidence of the random-sampling method is sufficient as a matter of law to support a determination that the entire substance recovered together and similarly packaged is the same controlled substance as that tested.'" *State v. Edwards*, 10th Dist. Franklin No. 12AP-992, 2013-Ohio-4342, ¶ 40, quoting *State v. Parsley*, 10th Dist. Franklin No. 09AP-612, 2010-Ohio-1689, ¶ 39, *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 81 (10th Dist.), and *State v. Smith*, 10th Dist. Franklin No. 97APA05-660, 1997 WL 798301, *3 (Dec. 23, 1997). Other Courts of Appeals in Ohio have accepted methods of random sampling, including hypergeometric sampling. *See, e.g.*, *State v. Coppernoll*, 6th Dist. Williams No. WM-07-010, 2008-Ohio-1293, ¶ 5-6, 13-14; *State v. Garnett*, 9th Dist. Medina No. 12CA0088-M, 2013-Ohio-4971, ¶ 7, 10.

{¶97} We also disagree with Gartrell that the State could not rely on hypergeometric sampling in this case because Rentz failed to adequately explain

the method or its reliability factor. Rentz testified that the hypergeometric-sampling formula used by BCI provides 95 percent confidence that at least 90 percent of all the units contain the same substance as the tested units, as long as the units appear to be homogeneous or identical. Therefore, Rentz explained hypergeometric sampling's reliability. And contrary to Gartrell's argument, Rentz testified that the contents of all 499 bindles, including the 28 he tested, appeared to be the same substance. Finally, Rentz's admitted unfamiliarity with the mathematics behind hypergeometric sampling does not render his use of the formula unreliable. After all, Rentz is a forensic chemist, not a mathematician.

{¶98} Viewing the evidence in a light most favorable to the prosecution, we conclude that Gartrell's drug-trafficking and drug-possession convictions are supported by sufficient evidence.

{¶99} We next address Gartrell's argument that his convictions were against the manifest weight of the evidence. We conclude that they were not. In support of his argument, Gartrell makes many of the same arguments that he makes in support of his sufficiency-of-the-evidence assignment of error. In addition, he argues that Rentz "admitted that his testing results were different from the prior scientist's results." (Appellant's Brief at 20). However, Rentz explained that the only difference was in the "ultimate weight" of the substance due to the prior scientist taking some of the substance for testing. Gartrell argues that Rentz

did not know whether he tested the same 28 bindles as the prior scientist. However, Rentz explained that he randomly selected his 28 bindles regardless of the prior scientist's selections. Gartrell offered no testimony—expert or otherwise—in response to Rentz and instead relied solely on his counsel's cross-examination of Rentz.

{¶100} While Rentz's testimony may have been confusing at first, he offered explanations, sometimes multiple times, for the methods he used to observe and test the contents of the 499 bindles. Gartrell did not object to the trial court qualifying Rentz as an expert concerning scientific analysis of controlled substances, including heroin. Rentz explained that he has conducted scientific analysis of suspected controlled substances thousands of times and of heroin several hundreds of times. As we noted above, in addition to Rentz's testimony, Isom, Utley, and Rowe testified that they heard Gartrell admit that he had 500 units of heroin in his suitcase.[3] Gartrell does not address this testimony under his second and third assignments of error, although he does contend under his first assignment of error that it is inadmissible.

{¶101} Based on the testimony of Rentz, Isom, Utley, and Rowe, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage

---

[3] At trial, Isom, Utley, and Rowe testified that Gartrell admitted that he had "500" units of heroin. At the suppression hearing, however, Isom and Utley testified that Gartrell admitted that he had "about 500" units of heroin, and Rowe testified that Gartrell said "something to the effect, I had 500 bindles." These apparent differences in the testimony do not render Isom, Utley, and Rowe without credibility or their trial testimony without weight, particularly in light of Gartrell's convictions for trafficking and possession of heroin in an amount equal to or greater than 100 unit doses but less than 500 unit doses.

of justice that Gartrell's drug-trafficking and drug-possession convictions must be reversed and a new trial ordered.

{¶102} Gartrell's second and third assignments of error are overruled.

**Assignment of Error No. IV**

**The trial court erred in overruling appellant Gartrell's motion to dismiss the charges on the basis of speedy trial time pursuant to R.C. 2945.71. (Tr., Vol. I, 133-156.)**

{¶103} In his fourth assignment of error, Gartrell argues that the trial court erred in overruling his oral motion to dismiss the case against him—which he made on the first day of trial, before the jury was sworn—because: "(1) the time between the ruling on the motion to suppress and the journal entry appointing counsel should not have been excluded from the speedy trial time calculation; and (2) the discovery sanction time was impermissibly taxed against the defendant when the delay was directly caused by the actions of the State." (Appellant's Brief at 27).[4]

{¶104} "A speedy trial claim involves a mixed question of law and fact for purposes of appellate review." *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 20, citing *State v. Masters*, 172 Ohio App.3d 666, 2007-Ohio-4229, ¶ 11 (3d Dist.). "Accordingly, a reviewing court must give due deference to

---

[4] Gartrell's brief exceeds the 25-page limit established by this court's local rule. *See* Loc.R. 7(B). Nevertheless, because the State did not object to the overage, and in the interests of justice, we will consider the entirety of Gartrell's brief. *See Wheeler v. Ohio State Univ.*, 10th Dist. Franklin No. 11AP-289, 2011-Ohio-6295, ¶ 11.

the trial court's findings of fact if they are supported by competent, credible evidence but will independently review whether the trial court correctly applied the law to the facts of the case." *Id.*, citing *Masters* at ¶ 11. "When reviewing a speedy-trial issue, an appellate court must calculate the number of days chargeable to either party and determine whether the appellant was properly brought to trial within the time limits set forth in R.C. 2945.71." *State v. Kesler*, 3d Dist. Seneca No. 13-13-35, 2014-Ohio-3376, ¶ 5, citing *State v. Riley*, 162 Ohio App.3d 730, 2005-Ohio-4337, ¶ 19 (12th Dist.).

**{¶105}** R.C. 2945.71(C)(2) provides: "A person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest." "[E]ach day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). "The date of the arrest is not included for the purpose of calculating time under the statutes for a speedy trial." *State v. Taylor*, 3d Dist. Allen No. 1-13-46, 2014-Ohio-1793, ¶ 27, citing *State v. Huston*, 3d Dist. Wyandot Nos. 16-05-23 and 16-05-24, 2006-Ohio-6857, ¶ 7. "The speedy trial provisions in R.C. 2945.71 are coextensive with constitutional speedy trial provisions." *Hansen* at ¶ 19, citing *State v. King*, 70 Ohio St.3d 158, 161 (1994).

**{¶106}** R.C. 2945.73(B) provides: "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he

is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." "'The prosecution and the trial courts have a mandatory duty to try an accused within the time frame provided by the statute.'" *Taylor* at ¶ 27, quoting *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, ¶ 14. "Strict compliance with the statute is required." *Ramey* at ¶ 14, citing *State v. Davis*, 46 Ohio St.2d 444, 448 (1976).

{¶107} "However, R.C. 2945.72 allows for an extension of the time that the accused must be brought to trial under certain circumstances." *Taylor* at ¶ 28. Excluded from the speedy trial calculation is "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E). This includes a motion by the defendant for discovery, which tolls the speedy-trial clock as long as the State responds to the motion in a reasonable amount of time. *Taylor* at ¶ 28, citing *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, ¶ 23, 26, *State v. Johnson*, 3d Dist. Marion No. 9-10-47, 2011-Ohio-994, ¶ 24, and *State v. Risner*, 3d Dist. Seneca No. 13-03-40, 2004-Ohio-186, ¶ 18. In addition, "[a]s long as the trial court's disposition occurs within a reasonable time, a defendant's motion to suppress tolls the speedy trial clock from the time the defendant files the motion until the trial court disposes of the motion." *State v. Curtis*, 3d Dist. Marion No. 9-02-11, 2002-Ohio-5409, ¶ 12, citing *State v. Arrizola*, 79 Ohio App.3d 72, 76 (3d Dist.1992).

"A motion for a bill of particulars also tolls the time for speedy trial calculations." *State v. Salyers*, 3d Dist. Marion No. 9-05-04, 2005-Ohio-5037, ¶ 10, citing *State v. Grinnell*, 112 Ohio App.3d 124, 134 (10th Dist.1996).

**{¶108}** Excluded from the speedy-trial calculation under R.C. 2945.72(H) is "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."  "[I]t is well-established that a defense motion to continue trial tolls the speedy trial clock until the rescheduled trial date."  *State v. Caulton*, 7th Dist. Mahoning No. 09 MA 140, 2011-Ohio-6636, ¶ 33, citing R.C. 2945.72(H) and *State v. Brown*, 7th Dist. Mahoning No. 03-MA-32, 2005-Ohio-2939, ¶ 41.  *See also State v. Quinnie*, 10th Dist. Franklin No. 12AP-484, 2013-Ohio-1208, ¶ 8. However, an accused's motion to continue a trial does not "'unconditionally extend the time limit in which an accused must be brought to trial * * *.'"  *State v. Johnson*, 3d Dist. Marion No. 9-10-47, 2011-Ohio-994, ¶ 22, quoting *Arrizola* at 75.  *See also State v. Littlefield*, 3d Dist. Marion No. 9-02-03, 2002-Ohio-3399, ¶ 7, quoting *Arrizola* at 75.  Rather, the speedy-trial time limit "is 'merely extended by the time necessary in light of the reason for delay.'"  *Arrizola* at 75, quoting Committee Comment to H.B. 511. *See also Johnson* at ¶ 22.

**{¶109}** "Sua sponte continuances are continuances 'granted other than on the accused's own motion'" and toll the speedy-trial time as long as the record

reflects "that the period of the continuance was 'reasonable.'" *Kesler*, 2014-Ohio-3376, at ¶ 5, citing *State v. Ramey*, 2d Dist. Clark No. 2010 CA 19, 2012-Ohio-6187, ¶ 12. "The reasonableness of the delay is determined based upon the specific facts and circumstances of each case." *Id.*, citing *State v. Daugherty*, 110 Ohio App.3d 103, 104 (3d Dist.1996). Ohio courts have concluded "that it is reasonable for a court to continue the matter to give recently appointed defense counsel time to prepare for trial." *State v. Redelman*, 12th Dist. Clinton No. CA2012-04-010, 2013-Ohio-657, ¶ 24, citing *State v. McRae*, 55 Ohio St.2d 149 (1978). *See also State v. Broomfield*, 10th Dist. Franklin No. 00AP-1420, 2001 WL 1002225, *2 (Sept. 4, 2001) ("Defendant is entitled to no speedy trial credit for the time period of the reasonable continuance granted to allow newly appointed counsel to prepare for trial.").

{¶110} In this case, Gartrell was arrested on March 26, 2013, and his trial commenced on December 3, 2013. (*See* Doc. No. 3); (Trial Tr., Vol. One, at 9-10). Because Gartrell was held in jail from the time of his arrest to the time of trial, the State had 90 days, or until June 25, 2013, to bring Gartrell to trial, barring any tolling of the speedy-trial time. (*See* Trial Tr., Vol. One, at 135, 137); *Kesler*, 2014-Ohio-3376, at ¶ 6. Gartrell's trial commenced 161 days after the expiration of the 90-day speedy-trial period. Therefore, we look to whether the speedy-trial period was tolled by at least 161 days.

{¶111} The parties do not dispute that the speedy-trial time ran for the 22-day period from March 26, 2013—the day after Gartrell's arrest—to April 17, 2013, when Gartrell moved for discovery and a bill of particulars. Nor do they dispute that Gartrell's various motions tolled the speedy-trial time for the 21-day period from April 17, 2013 to May 8, 2013. The parties do not dispute that the speedy-trial time ran for the 20-day period from May 8, 2013 to May 28, 2013, on which day Gartrell filed his motion to suppress. Finally, Gartrell does not appear to dispute that his motion to suppress tolled the speedy-trial time for the 51-day period from May 28, 2013 to July 18, 2013, on which day the trial court overruled Gartrell's motion to suppress.

{¶112} The parties disagree, however, concerning whether the speedy-trial clock restarted on July 18, 2013. Gartrell argues, without citing authority, that the trial court's July 18, 2013 decision concerning his motion to suppress "restarted" the speedy-trial clock, notwithstanding Gartrell's May 28, 2013 motion to continue the trial. (Appellant's Brief at 26). The State argues that on June 4, 2013—while the speedy-trial time was tolled based on Gartrell's May 28, 2013 motion to suppress—Gartrell filed a motion to continue the trial, which independently tolled the speedy-trial time until September 24, 2013—the new trial date set by the trial court. We disagree with Gartrell and agree with the State.

{¶113} The trial court concluded that Gartrell's motion to continue the trial tolled the speedy-trial time for the 68-day period from July 18, 2013 to September 24, 2013 over which the parties disagree. (Trial Tr., Vol. One, at 142-155). On June 4, 2013, while his May 28, 2013 motion to suppress was pending, Gartrell moved to continue the trial because his counsel was scheduled to appear at oral argument in another case. (Doc. No. 36). As the trial court observed, Gartrell's request for a continuance was "open-ended" and did not request that the trial be rescheduled by any certain date.[5] (Trial Tr., Vol. One, at 152-153). Moreover, on July 18, 2013, the trial court disposed of Gartrell's motion to suppress, which involved multiple factual and legal issues. Thirteen days later, the trial court set the new trial date of September 24, 2013—55 days away. The 68-day period between July 18, 2013 and September 24, 2013 was not longer than necessary in light of the circumstances of this case, particularly because it was Gartrell who requested the continuance. *See State v. Carr*, 4th Dist. Ross No. 12CA3358, 2013-Ohio-5312, ¶ 35. Therefore, Gartrell's June 4, 2013 motion to continue the trial tolled the speedy-trial time between July 18, 2013 and September 24, 2013. *See Caulton*, 2011-Ohio-6636, at ¶ 33; *Johnson*, 2011-Ohio-994, at ¶ 22.

---

[5] The trial court also described Gartrell's June 4, 2013 motion for a continuance as an "unlimited continuance." (Trial Tr., Vol. One, at 153). However, there are no "unlimited" continuances under R.C. 2945.72(H), even if it was the accused who moved for the continuance. *See Johnson*, 2011-Ohio-994, at ¶ 22, quoting *Arrizola*, 79 Ohio App.3d at 75.

{¶114} On September 9, 2013, before the newly scheduled trial date of September 24, 2013, Gartrell's initial counsel moved to withdraw. On September 18, 2013, the trial court continued the trial once again when it granted Gartrell's initial counsel's motion to withdraw and appointed Gartrell new counsel. On October 11, 2013, the trial court set the new trial date of November 14, 2013. Gartrell agreed when he made his motion to the trial court that the speedy-trial time was tolled for the 51-day period from September 24, 2013 to November 14, 2013. (Trial Tr., Vol. One, at 145). Indeed, that 51-day period was a reasonable continuance under R.C. 2945.72(H), granted by the trial court to allow Gartrell's new counsel time to prepare for trial. *Redelman*, 2013-Ohio-657, at ¶ 24.

{¶115} The total number of days during which the speedy-trial time was tolled between Gartrell's March 26, 2013 arrest and November 14, 2013 is 191 days, well over the 161 needed to avoid a speedy-trial violation. Therefore, Gartrell's speedy-trial rights were not violated, and we need not address his other arguments concerning speedy-trial time—namely, whether his November 7, 2013 motion for discovery sanctions tolled the speedy-trial time. Even assuming the speedy-trial time ran between November 7, 2013 and December 3, 2013, it still would not result in a speedy-trial violation.

{¶116} Gartrell's fourth assignment of error is overruled.

**{¶117}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**